**HOWELL HYDROCARBONS, INC.,**
Plaintiff–Appellant,

v.

**John ADAMS, et al.,**
Defendants–Appellees.

No. 89–5572.

United States Court of Appeals,
Fifth Circuit.

March 27, 1990.

Rehearing Denied April 25, 1990.

Eugene B. Wilshire, Jr., Jacalyn D. Scott, Wilshire, Scott, Halbarch & Dyer, Houston, Tex., for plaintiff-appellant.

D. Bobbitt Noel, Jr., Vinson & Elkins, Houston, Tex., for defendants-appellees.

Appeal from the United States District Court for the Western District of Texas.

Before HIGGINBOTHAM, SMITH and DUHÉ, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Howell Hydrocarbons, Inc. appeals from the district court's grant of summary judgment in favor of the defendants. The district court granted summary judgment on Howell's RICO claims on the grounds that they were barred by res judicata, and that there was insufficient evidence of the pattern of racketeering necessary to support those RICO claims. The district court then dismissed Howell's pendent state law claims. While we disagree with the district court that Howell's claims were barred by res judicata, we affirm the summary judgment because there was insufficient evidence of a pattern of racketeering.

I

Plaintiff–Appellant Howell Hydrocarbons, Inc. is a Delaware corporation which maintains its principal place of business in San Antonio, Texas. Howell refines and markets petroleum products, including jet fuel.

Defendants Warren Tomlinson and Harold Harris were directors, officers and shareholders of Tomlinson Oil Company. TOC was a publicly traded oil and gas company. Pioneer Refining Ltd. was a Texas limited partnership. TOC effectively

owned over 90% of Pioneer because Pioneer's general partner, Tomlinson Refining, Inc., was a wholly owned subsidiary of TOC. Tomlinson was the sole limited partner in Pioneer and owned the remaining 8.3% not controlled by TOC.

Defendants Randall Smith, Basil Vasiliou and Smith–Vasiliou Management, Inc., acquired a controlling interest in TOC in 1983 and 1984. Smith, Vasiliou and SVM, securities traders, obtained their interest in TOC in part through the purchase of TOC debentures by Bronstein Factors, Inc., an entity they controlled. Defendant John Adams was Smith and Vasiliou's New Jersey tax attorney. Adams was appointed to the TOC board in 1983 and became TOC's chief executive officer in 1984.

In 1983 and 1984 Howell sold jet fuel on credit to Pioneer so that Pioneer could fulfill part of its contract to supply jet fuel (the JP–4 contract) to the United States. Howell's terms were net 10, but the usual time between delivery and payment was 13 days. The government usually paid Pioneer for deliveries on the 11th day. The JP–4 contract was to be up for renewal on April 1, 1984, and Howell's contract with Pioneer was to expire on the same day. Pursuant to its contract with Howell, a standby letter of credit was to be outstanding to cover payments owed for the fuel delivered. This letter of credit had been arranged with Mellon Bank, and it had been renewed, the latest renewal to end on March 31, 1984. From March 21 through April 3, 1984, Pioneer took ten deliveries of jet fuel from Howell with a total invoice of just over $344,000. Pioneer never paid for these deliveries, although Pioneer did resell the fuel to the U.S. and received payment for it within eleven days of each delivery, as was customary. Pioneer ceased all business on April 3, 1984. On April 3 and 4, Pioneer wire-transferred most of the available funds out of its bank accounts with Mellon Bank to TOC bank accounts at other institutions.

Howell maintains that the Bronstein group wanted control of TOC because TOC had a large tax net operating loss carry forward, and to take personal advantage of this, Smith and Vasiliou had to gain effective control of 80% of TOC. Howell also alleges that they wanted to take advantage of Pioneer's cash flow arrangement resulting from the government contract, and that during 1983 and 1984 cash was transferred from Pioneer to TOC on a regular basis.

Mellon Bank was a major lender to TOC and Pioneer during this period. Mellon was owed approximately $8,500,000 and had a first lien security interest in all assets of both entities. Mellon maintained escrow, collateral and operating accounts for both companies. Receivables were accumulated in the escrow accounts to service the monthly debt. The debt service was transferred to the collateral account and the remainder to the operating accounts.

The Bronstein group began meeting with Mellon in December 1983, seeking a restructuring of the debt. Several proposals were put forth to Mellon, each of which required Mellon to forgive debt, which it refused to do because it was adequately secured. Howell alleges that at a meeting on January 5, 1984, with Harris, Smith, and Vasiliou present, it was disclosed to Mellon that a million dollar "negative working capital" existed in connection with Pioneer's JP–4 contract because of float between payment and billing. Howell alleges that the defendants also disclosed that they intended to "divest" Pioneer of the JP–4 contract. When this occurred, the defendants explained, the million dollar negative, which was made up of the account debts to Howell and Triangle, another jet fuel supplier, would have to be paid by the Mellon letters of credit. Howell claims that this disclosure established that money was being diverted out of Pioneer in amounts sufficient to assure that when deliveries of the jet fuel ceased, Pioneer would owe its jet fuel suppliers at least one million dollars more than it was due to receive. Howell contends that what was said at these meetings proves that the defendants knew of the shortfall. Howell also alleges that the result of these meetings was that they "realistically assured that Howell's letter of credit would not be renewed upon expiration in March of 1984." Howell alleges

that at this time the defendants knew that they were going to terminate the JP–4 contract which would leave them with a cash shortage, and a significant account debt to Howell that they did not intend to pay.

Howell alleges that the Bronstein group intended to merge TOC with Bronstein and utilize the loss carry forward. It further alleges that the new board wanted to take TOC into Chapter 11, and would probably siphon off funds out of the Mellon accounts into other bank accounts to build up a war chest. In other words, they would receive product from their suppliers and sell to the government under their JP–4 contract and let the payables build up to a maximum and then file for bankruptcy under Chapter 11.

Howell also alleges that the defendants met on April 2, 1984, and decided at that meeting to take one more shipment from Howell, for which they had no intention of paying, and then would cease performing under the JP–4 contract. They instructed TOC's treasurer to transfer substantially all of Pioneer's money on account at Mellon into TOC accounts in other banks in order to prevent Mellon from freezing the funds. Howell also alleges that the defendants intended to keep this secret from Howell and Triangle, thus defrauding them, for if they were told, Howell and Triangle would have presented their letters of credit to Mellon, and Mellon would have frozen the accounts.

Howell alleges that if it had been advised of the true facts—the million dollar negative as imparted to Mellon in January 1984, the nonrenewal of the letter of credit, the defendants' bankruptcy plans, and the defendants' plans to transfer all of Pioneer's funds to banks other than Mellon—Howell would not have allowed any extensions of credit to Pioneer, and would have suffered no losses.

On May 14, 1984, before the filing of the bankruptcy actions, Howell filed *Howell Hydrocarbons, Inc. v. Pioneer Refining, Ltd. et al.*, No. 84–23115, in Harris County, Texas, alleging that the foregoing facts constituted common law fraud and breach of contract. On June 11, 1984, TOC, Tomlinson Refining, and Pioneer all filed for reorganization under Chapter 11. Howell filed a Proof of Claim on February 1, 1985. On July 25, 1985, the debtors filed a consolidated plan of reorganization, and after a disclosure statement was approved, the court set August 30, 1985, as the deadline for filing objections to confirmation of the Plan. On August 20, 1985, the debtors filed their application to consolidate all three cases substantively on the grounds that they were really one business entity and had conducted their affairs as such. After due notice to all creditors, including Howell, and with no objections, the Bankruptcy Court consolidated the three bankruptcies. Howell got all of the required notices. There were no objections to confirmation, and the plan was confirmed on September 10, 1985.

Howell filed this suit in February 1986, alleging that the defendants, who were shareholders, officers, directors and managing agents of TOC, caused damage to Howell by operating TOC and Pioneer in a fraudulent manner. Howell asserted RICO claims, based upon mail and wire fraud and bankruptcy fraud, and state law claims of alter ego and common law fraud. Howell maintained that the defendants fraudulently operated Pioneer and TOC in such a way that they intentionally created a false impression that Pioneer was solvent, so that Howell would continue supplying jet fuel to Pioneer on credit. Howell also alleged that in contemplation of the bankruptcy filings the defendants caused the depletion of all of Pioneer's cash by effectuating six wire transfers of over $1 million from Pioneer accounts to TOC accounts. A magistrate entered summary judgment on three grounds: first, that there was insufficient evidence of RICO as to all six defendants; second, that all claims were barred by res judicata; and third, that Howell lacked standing to assert the RICO claim based on bankruptcy fraud. The district court adopted the magistrate's findings, and granted summary judgment. Howell appeals.

## II

Howell argues that the district court erred in finding that all of its claims were

barred by res judicata based upon the prior order of the bankruptcy court confirming the reorganization plan. In *D–1 Enterprises, Inc. v. Commercial State Bank,* 864 F.2d 36 (5th Cir.1989), this court stated: "Essential to the application of the doctrine of res judicata is the principle that the previously unlitigated claim to be precluded could and should have been brought in the earlier litigation." *Id.* at 38. Howell argues that its cause of action neither could nor should have been brought earlier. We agree.

Four requirements must be met in order to apply res judicata: (1) the parties must be identical in both suits; (2) the prior judgment must have been rendered by a court of competent jurisdiction; (3) there must be a final judgment·on the merits; and (4) the same cause of action must be involved in both cases. *Nilsen v. City of Moss Point, Miss.,* 701 F.2d 556, 559 (5th Cir.1983) (en banc). *See also Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 327 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). Howell argues that this case does not meet those standards, for this case does not involve the same claims and the same parties as the bankruptcy proceeding, and the bankruptcy court lacked jurisdiction to decide these claims. The appellees concede that in the context of a bankruptcy case there must have been a procedural system available to Howell that would have permitted it to raise its claims in the bankruptcy proceedings in order for them to bar the litigation here. They maintain, however, that Howell could have raised its claims in the bankruptcy case by objecting to confirmation of the Plan pursuant to sections 1128(b) and 1129(a)(3) of the Bankruptcy Code. If the objection were meritorious, the bankruptcy court could have fashioned a remedy subordinating or adjusting the various interests of the defendants to that of Howell under the Plan. The appellees argue that the bankruptcy court has the power to deny confirmation of a Plan proposed in bad faith, and equitable subordination is appropriate where the one whose interest is being subordinated engaged in some type of inequitable conduct, the misconduct resulted in injury

to the creditors of the debtor, and equitable subordination is not inconsistent with the provisions of the Bankruptcy Code.

The defendant's novel argument is plausible at first glance, but upon closer consideration, it is not persuasive, for the four requirements for res judicata were not met: there was no unity of parties, the causes of action asserted are not the same in this suit as in the bankruptcy proceeding, and the bankruptcy court would not have had jurisdiction to hear Howell's claims against ·the defendants.

Howell argues that there was no identity of the parties between the bankruptcy and this case, for in the bankruptcy proceedings the defendants were present only in their corporate representative capacities, whereas Howell's current claims are against the defendants in their individual capacities. Res judicata does not apply when the parties appear in one action in a representative capacity and in a subsequent action in an individual capacity. *Clark v. Amoco Production Co.,* 794 F.2d 967, 973 (5th Cir.1986).

The identity of parties test is met not only as to parties to the earlier litigation, however, but also to those in privity with them. *Id.; Lubrizol Corp. v. Exxon Corp.,* 871 F.2d 1279 (1989); *Drier v. Tarpon Oil Co.,* 522 F.2d 199, 200 (5th Cir. 1975). A non-party is in privity with a party for res judicata purposes in three instances: (1) if he is a successor in interest to the party's interest in the property; (2) if he controlled the prior litigation; or (3) if the party adequately represented his interests in the prior proceeding. *Benson & Ford, Inc. v. Wanda Petroleum,* 833 F.2d 1172 (5th Cir.1987). *See also Southwest Airlines Co. v. Texas International Airlines,* 546 F.2d 84 (5th Cir.), *cert. denied,* 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977). The defendants are not successors in interest to the debtors, nor did they control whether or not the claims asserted in this suit were brought in the earlier proceeding, for the claims are against them. Howell was a party to the earlier action, but it could not have brought RICO

claims against third parties in bankruptcy court.[1]

■ The appellees contend that the claim Howell could have made in the bankruptcy case involves the same cause of action that is now asserted by Howell in this lawsuit. This argument is meritless. While there is a common nucleus of operative fact between the two cases, in that if it had objected to the Plan, Howell would have alleged the same fraudulent actions that it alleges in this case, the remedy sought here and the theory upon which liability is premised are different from what could have been asserted through a request for equitable subordination in the bankruptcy court.[2] Moreover, the bankruptcy court would not have had jurisdiction over the RICO claims against the defendants.

In *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the Court held the jurisdictional provision of the 1978 Bankruptcy Reform Act unconstitutional because it impermissibly vested Article III judicial powers in bankruptcy judges. A bankruptcy court could not adjudicate a debtor's claims for breach of contract and breach of warranty against a private entity, for bankruptcy judges' positions were created under Article I of the constitution, and they did not enjoy the life tenure and guaranteed compensation protections found in Article III. The plurality opinion recognized three exceptions to Article III's restriction of judicial power to courts whose judges had its protections. In addition to territorial courts and courts martial, legislative courts and administrative agencies were permitted to adjudicate cases involving "public rights." The plurality opinion, per Justice Brennan, suggested that only "core proceedings," could involve public rights permitting jurisdiction, stating specifically:

> [T]he restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case. The former may well be a "public right," but the latter obviously is not.

458 U.S. at 71, 102 S.Ct. at 2871.

■ In 1984 Congress responded to the Supreme Court's decision with a new jurisdictional provision, now codified at 28 U.S.C. § 157. Lower courts have presumed its constitutionality. Pursuant to § 157, a bankruptcy court has the power to "hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1). A bankruptcy judge may hear a non-core proceeding and make proposed findings of fact and conclusions of law to the district court, but he may not enter a final order or judgment. 28 U.S.C. § 157(c)(1). Thus, only if Howell's claims against the defendants personally would have constituted a core proceeding in Pioneer's bankruptcy proceedings can we say that these claims should properly have been before that court. It is evident that these claims would not have constituted such core proceedings.

In *Matter of Wood*, 825 F.2d 90 (5th Cir.1987), we concluded that "a proceeding

---

1. The cases cited by the defendants in support of privity all involve *plaintiffs* who were not named parties in previous suits, but were nonetheless barred from raising claims in later suits because their interests had been represented in the earlier cases. This suit involves the use of res judicata by *defendants* who were not parties to the earlier suit. In *Lubrizol v. Exxon,* 871 F.2d 1279 (5th Cir.1989), three Exxon employees asserted res judicata as a defense to claims in a subsequent suit that were the same as claims settled in an earlier suit to which Exxon was a party. This court found the claims against the employees barred because they could have been raised in the earlier proceeding, and because the entire basis for Exxon's alleged liability in the earlier suit was vicarious liability for the actions of the employees acting within the scope of their employment. *Id.* at 1288–89. The theory of liability and the relief sought were the same in both suits. Such is not the case here. The claims against the defendants are not premised upon theories under which Pioneer could have been vicariously liable.

2. It is unclear whether equitable subordination would have been possible for at least one of the defendants. It is not alleged that John Adams was a shareholder in any of the debtors.

is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy proceeding." *Id.* at 97. It is clear from that definition that Howell's claims against the officers, directors and shareholders of the debtor would not have had core status. The RICO claims do not invoke a substantive right provided by title 11, nor do they arise only in the context of bankruptcy proceedings. They invoke a completely independent federal right, and are precisely the kinds of claims *Northern Pipeline* established Congress could not commit to the bankruptcy courts for resolution.

Whatever else a core proceeding must be, it must involve a decision that ultimately affects the distribution of the debtor's assets. Howell's claims do not and would not affect the estate or the distribution of the debtor's assets. The claims are strictly against the defendants in their individual capacities, and there is no claim of vicarious liability on the part of the debtors or the estate. Therefore, Howell's claims against the defendants are not barred by res judicata.

### III

The Racketeer Influenced and Corrupt Organizations Act, Pub.L. 91–452, Title IX, 84 Stat. 941, as amended, 18 U.S.C. §§ 1961–1968 (1982 ed. and Supp. V), imposes civil liability on those who engage in certain "prohibited activities," defined as requiring proof of either "a pattern of racketeering activity" or "collection of an unlawful debt." 18 U.S.C. § 1962. "Racketeering activity" means any act indictable under various specified federal statutes, and certain federal offenses. 18 U.S.C. § 1961(1). The statute indicates only that a "pattern" "requires at least two acts of racketeering activity" within a ten year period. 18 U.S.C. § 1961(5).

A civil RICO claim under 18 U.S.C. § 1962(c)[3] must involve a person who engages in a pattern of racketeering activity connected to the acquisition, establishment, conduct or control of an enterprise. *H.J. Inc. v. Northwestern Bell Telephone Co.,* — U.S. ——, 109 S.Ct. 2893, 2987, 106 L.Ed.2d 195 (1989); *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Delta Truck & Tractor, Inc. v. J.I. Case,* 855 F.2d 241 (5th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989); *Monsanto v. Seafirst Commercial Corp.,* 818 F.2d 423, 424 (5th Cir.1987). The Supreme Court has rejected both the view that predicate acts of racketeering may form a pattern only when they are part of separate illegal schemes, *see H.J. Inc. v. Northwestern Bell Telephone Co.,* 829 F.2d 648 (8th Cir.1987), and the equally extreme view that a pattern is established merely by proving two predicate acts, *see, e.g., United States v. Jennings,* 842 F.2d 159, 163 (6th Cir.1988). *H.J. Inc.,* 109 S.Ct. at 2899. "While two acts are necessary, they may not be sufficient." *Id.* (quoting *Sedima,* 105 S.Ct. at 3285, n. 14).

> RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff ... must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.

*H.J. Inc.,* 109 S.Ct. at 2900. The Supreme Court further explained this concept of "continuity" as either "a closed period of repeated conduct," or "past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 2902. But, "predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* The Court provided several examples of activity showing this continuity, all indicating activities that amount to or threaten long-term criminal activity. *Id.*

---

3. Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or partic- ipate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The defendants argued that there was insufficient evidence of both predicate acts and pattern of racketeering. The district court granted summary judgment, holding that there was insufficient evidence of wire fraud, and that Howell did not have standing to assert bankruptcy fraud. We affirm the summary judgment in favor of the defendants, for there is insufficient evidence of either the predicate acts of wire and bankruptcy fraud or the continuity necessary for a pattern of racketeering.

■ In determining whether a motion for summary judgment is properly granted in a case, the Court must determine "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56, Fed.R.Civ.P. Essentially, the moving party has the burden of informing the Court of the basis for its motion and identifying pleadings and other record evidence which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once that is done, it is incumbent upon the non-moving party to go beyond the pleadings and by affidavits of his own, or by "the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* In determining what is a material fact, the Court must review the substantive law of the case for identifi-cation of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ The first pattern of racketeering Howell alleged is a mail fraud[4] or wire fraud[5] scheme, requiring a scheme to defraud by means of false pretenses, which include representations or promises, and (2) use of the mails or interstate wire communications in furtherance of the scheme. *In the Matter of Lewisville Properties, Inc.*, 849 F.2d 946, 951 (5th Cir.1988); *United States v. Gordon*, 780 F.2d 1165 (5th Cir. 1986). Howell alleges wire fraud comprising a "kiting," "bust out," ' or "ponzi" scheme.

■ Howell asserts that the "million dollar negative working capital" amounted to mail or wire fraud as a check kiting scheme. "Check-kiting" has been defined by the courts as involving the "passing of checks between two or more banks to obtain unauthorized credit from each bank during the time it takes the checks to clear." *Bay Area Bank v. Fidelity & Deposit Corp. of Maryland*, 629 F.Supp. 693, 695, n. 3 (N.D.Cal.1986); *Mitsui Mfrs. Bank v. Federal Insurance Company*, 795 F.2d 827, 830 n. 2 (9th Cir.1986). *See also Williams v. United States*, 458 U.S. 279, 281 n. 1, 102 S.Ct. 3088, 3089 n. 1, 73 L.Ed.2d 767 (1982), which explains the term by example. There is no evidence of the "check kiting" that Howell claims is mail or wire fraud by the defendants, for there is no evidence that the defendants passed bad

---

**4.** 18 U.S.C. § 1341 provides in pertinent part:

 Frauds and Swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or

thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

**5.** 18 U.S.C. § 1343 provides:

 Fraud by wire, radio, or television

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

checks or established bank accounts with insufficient funds. Howell argues that Pioneer did not match government receivables to the particular Howell invoices that generated those receivables. This does not constitute wire or mail fraud, but is a general operating procedure, in which a company treats its accounts receivable as fungible goods.

 Howell next asserts that the defendants perpetrated a classic "bust out" scheme.[6] The evidence that Howell points to as proving such a scheme is a memo consisting of a series of notations of an alleged telephone conversation between Mellon Bank and Tom Neff. The district court found this evidence insufficient to create a genuine issue of fact. The notes made by R.A.E. are unsworn hearsay, from information which is admittedly speculation by Tom Neff. They are not admissible evidence. They could be admitted to show that the conversation occurred, but they may not be admitted to prove the truth of Neff's assertions. In order to defeat summary judgment, it is necessary to support allegations with admissible evidence. *In the Matter of Lewisville Properties, Inc.*, 849 F.2d 946, 950–51 (5th Cir.1988). Nor can Howell prove fraud simply because it was paid for its deliveries for a period of about 1 1/2 years. Although this may have led Howell to believe that Pioneer was stronger financially than it really was, it does not constitute fraud.

To create a false impression of solvency in order to induce the extension of credit to an insolvent firm, as the complaint alleges the defendants did in order to induce the plaintiff ... to continue selling to [the debtor], is to commit fraud in its commonest form as deliberate misrepresentation, by perpetrating the classic "bust-out" that has been held time and again to violate the mail and wire fraud statutes.

*Sutliff v. Donovan Companies, Inc.*, 727 F.2d 648, 653 (1984). While it is fraudulent to make a company appear solvent when it is not, and a claim may be stated under RICO against the individuals who commit the acts of fraud, *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1273–74 (7th Cir. 1989), Howell has not pointed to any misrepresentations made by the defendants to mislead Howell into believing Pioneer and TOC were solvent. In both *Sutliff* and *Ashland* the defendants made actual misrepresentations about financial soundness including copies of false financial statements. There was no such misrepresentation here, and no other evidence of such a "bust out."

 Howell also asserted that a pattern of racketeering existed with respect to the funds that were transferred from Pioneer's account at Mellon to TOC accounts at other banks after the decision was made to no longer pay Howell. It is undisputed, however, that Tomlinson Refining, TOC, and

**6.** A classic "bust out" has been described as follows:

A bust out begins with the formation by the malefactors of a seemingly legitimate wholesale business. The fledgling business's first goal is to establish a favorable credit rating. This task is accomplished by a number of devices which can include temporarily putting cash into the business in order to create a strong balance sheet, bribing credit rating agencies, and inflating financial statements so as to vastly overstate the business's assets and net worth. Also, bills for the company's initial purchases are promptly paid—thus furthering the deception through enhancement of the company's credit standing. As the business becomes more established, its promoters order considerable amounts of additional merchandise although they have no intention of paying for these goods. A huge inventory, most of it not paid for, is built up. The principals then busy themselves disposing of their purchases at substantial discounts or secreting the unsold portion for later below-cost covert sales. In other words, they "bust out" the business. The company is then petitioned into bankruptcy with the mulcted creditors left to pick over the meatless carcass of an assetless enterprise. The con men, or at least those whose names are legally associated with the bankrupt company, suffer a loss of their credit standing and "good" name. In return, they and their coconspirators reap handsome monetary benefits for having arranged in advance the demise of a local wholesale outfit. *United States v. Crockett*, 534 F.2d 589, 592 (5th Cir.1976). *United States v. Tashjian*, 660 F.2d 829 (1st Cir.), *cert. denied sub nom. Campbell v. United States*, 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981).

Pioneer were alter ego companies. This transfer of funds from the company's account at one bank to its account at another was not fraud. In addition, the district court found that Howell had no standing to assert this as a claim of bankruptcy fraud.[7]

 Howell argues that even though it might not be able to raise a claim of bankruptcy fraud, its claim is for violations of the RICO statute, with bankruptcy fraud only amounting to a predicate act. Regardless of Howell's standing to assert bankruptcy fraud, summary judgment was proper. Howell has not adequately alleged bankruptcy fraud or pointed to any evidence showing that either it or the estate were hurt by the alleged transfer of funds. It has not alleged that the Mellon accounts were the only accounts out of which it could be paid. Howell itself has alleged that TOC and Pioneer were alter egos and essentially one company, and Howell did not object to the consolidation of the bankruptcies. There could be no bankruptcy fraud when the defendants transferred funds from Pioneer's account to TOC accounts, for they were not secreting funds in anticipation of bankruptcy, or removing funds from the bankruptcy estate; the funds in the other TOC accounts became a part of the bankruptcy estate. This ground for summary judgment was asserted by the defendants below. Although the district court may have granted summary judgment on a different basis, summary judgment may be affirmed on other grounds asserted by the defendants. There was insufficient evidence of the predicate act of bankruptcy fraud, for the funds were never transferred to the defendants, but were transferred into other accounts of the debtors that became part of the bankruptcy estate.

 The only fraud that Howell can point to in support of its RICO claims is the allegation that it was told that the letter of credit would "be taken care of." It is not clear whether this representation was made in person by one of the defendants, or was made in a letter or over the telephone. Even if such an actual misrepresentation were made through the mail or the telephone, and were sufficient for indictment as mail or wire fraud, it would be insufficient for RICO liability. A single misrepresentation or fraudulent statement is not enough to provide the continuity required for a pattern of racketeering. There has been no indication of activities that amount to or threaten long term criminal activity. *See H.J. Inc. v. Northwestern Bell,* 109 S.Ct. at 2902.

### IV

Although the district court erred in holding that Howell's claims against the defendants were barred by res judicata because of the confirmation of a plan in an earlier bankruptcy proceeding we nonetheless affirm the summary judgment and dismissal on alternate grounds. Howell did not adequately allege or point to sufficient evidence of a pattern of racketeering to create a genuine issue of material fact for trial.

AFFIRMED.

**7.** Although Howell maintains that the district court could not grant summary judgment on this ground because it was not asserted by the defendants and Howell was given no notice that this was an issue, this claim was asserted in the defendants' Supplement to their Summary Judgment and Dismissal Motions. Whether Howell was given sufficient time to review and oppose this issue need not be determined, for we affirm the summary judgment on a ground for which Howell received sufficient notice.