**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 91-5091**
_____

**IN THE MATTER OF:    RAYWOOD F. BAUDOIN,
LOUELLA H. BAUDOIN and
RAYWOOD BAUDOIN, INC., Debtors.**

**BANK OF LAFAYETTE,**

**Appellant,**

**VERSUS**

**RAYWOOD F. BAUDOIN, LOUELLA H. BAUDOIN
AND RAYWOOD BAUDOIN, INC.,**

**Appellees.**

_____

Appeal from the United States District Court
for the Western District of Louisiana
_____

(January 6, 1993)

Before REYNALDO G. GARZA, DAVIS, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

At issue is whether Chapter 7 debtors may, three years after discharge, bring a lender liability action in state court against their creditor which, _inter alia_, bid in its mortgages to purchase the debtors' property sold during their personal bankruptcies in liquidation of their estate, and filed a proof of claim and received partial payment in the bankruptcy for the debtors' wholly-owned corporation.  Because we hold that the lender liability claim would have been a "core proceeding" in the earlier bankruptcy actions, the state action is barred by _res judicata_.  Therefore, we

**REVERSE** the district court's summary judgment for the debtors and **RENDER** judgment for the creditor.

## I.

Beginning in 1978, the Bank of Lafayette (Bank) had a lending relationship with Mr. and Mrs. Raywood F. Baudoin and their wholly-owned corporation, Raywood F. Baudoin, Inc. (RFBI).  In 1985, the Bank made three separate loans to RFBI, totalling over $500,000. Each was secured by Mr. Baudoin's personal guarantee, mortgages on two pieces of the Baudoins' real property (in Lafayette and Grand Coteau, Louisiana), and an assignment of RFBI's accounts receivable.  The Bank also reserved the right to offset the balance of RFBI's deposit accounts by any amount due on the notes and to accelerate amounts due on all three notes, should RFBI fail to meet its obligations under any one of them.  At that time, the Baudoins' personal debt to the Bank was approximately $183,000.  It, too, was secured by the Lafayette and Grand Coteau properties.

One of RFBI's notes was due on August 23, 1985.  Not having received payment by August 30, the Bank offset an RFBI account by approximately $120,000 and notified RFBI's debtors to forward future payments directly to the Bank.  Approximately one month later, RFBI and the Baudoins, individually, filed for Chapter 7 bankruptcy.

For their personal bankruptcies, the Baudoins listed the Bank as a secured creditor for slightly over $183,000 and an unsecured creditor for an unknown amount.  In the schedule of assets, under the category "Property of any Kind not Otherwise Scheduled", they

2

listed "Any possible claim against creditor for actions taken against debtors prior to bankruptcy proceeding" and assigned an "undetermined" value.

The Baudoins' personal bankruptcies were consolidated; and on October 1, 1985, W. Simmons Sandoz was appointed trustee for the Baudoins and RFBI. The first meeting of the Baudoins' creditors was held on November 7, 1985.[1] Though the record includes no formal notice, it appears, pursuant to statements by Sandoz in the state court record and responses given at oral argument before us, that the Baudoins informed the trustee of their possible claim against the Bank very early in the bankruptcy proceeding.

Approximately one month later, *on motion of the trustee* in the personal bankruptcies, the two properties securing the Baudoins' personal debt to the Bank, as well as the Bank's loans to RFBI, were sold at a public auction in an effort to liquidate all of the Baudoins' assets. The Bank purchased both tracts, not only bidding in its mortgages, but also paying the claim of the first lienholder on the Lafayette property. The Baudoins were discharged in January 1986[2]; the auction sales were ratified and previous liens and mortgages cancelled in March and April of that year.

---

[1] At that time, the trustee asked the Baudoins, *inter alia*, "Does anyone owe you any money?", "Do you have any claims for injuries or damages pending?", and "Do you have any law suits where you are suing anyone pending?". They answered "no" to each question and signed a sworn statement reflecting those answers.

[2] The Baudoins waived their attendance at the discharge hearing, stating that they had "no motions of a substantive nature to bring before the court".

3

In the RFBI bankruptcy, the Bank filed two proofs of claim in late 1985.  In May 1986, *again upon consent of the trustee*, the automatic stay in the RFBI bankruptcy was modified, allowing the Bank to proceed with collection of RFBI's accounts receivable. Three years later, in April 1989, the Bank's claim was allowed in the amount of nearly $360,000.  The RFBI bankruptcy remains open.

In March 1989, the month before the Bank's claim was allowed in the RFBI bankruptcy and over three years after the Baudoins' discharge, the Baudoins filed suit in Louisiana state court against the Bank, seeking over $4,000,000 in damages for both breach of the loan agreements and numerous related tort claims.[3]  Their basic contention was that the Bank's actions forced them and their company, RFBI, into bankruptcy.  The Bank filed exceptions in state court, as well as a separate federal action, seeking to enjoin the state action and any attempted similar actions by the Baudoins or RFBI.

In state court, the exceptions for prescription of the tort claims and no right of action were sustained.  The Baudoins were given leave to either obtain an order of abandonment or add the trustee as a plaintiff; they chose the latter, adding him in late

---

[3]     Although named as a plaintiff in the state court Petition for Damages, RFBI claimed no damages and sought no relief.  In their response to the Bank's exceptions, the Baudoins stated that RFBI was "inadvertently included in the caption on plaintiffs' Petition for Damages.  RFBI is not a party to this action".

4

August 1989.[4]  No ruling was made on the *res judicata* exception;

instead, the state court withheld judgment pending this action.

Meanwhile, after the Bank's federal action was filed, the

Baudoins' personal bankruptcies were re-opened.  The Bank's action

(this case) was then transferred to bankruptcy court, where both

sides moved for summary judgment.  It was granted for the Baudoins

on the ground that the lender liability claim was not a "core"

matter and could not have been pursued earlier in the bankruptcy

court.  Finding the bankruptcy court's decision "supported by the

evidence and well within the bounds of discretion",[5] the district

court affirmed in a two paragraph order, holding that the lender

liability claim was not a "core" proceeding and, therefore, not

barred by *res judicata*.

## II.

The Bank contends that the district court erred as a matter of

law in not holding the state court claim barred by either *res*

---

[4]    By affidavit, filed in state court in support of the Baudoins'
objections to the Bank's exceptions, the trustee stated that he
intended to abandon this claim to the debtors.  A professed intent
to abandon cannot constitute abandonment, as 11 U.S.C. § 554(a)
requires notice and a hearing prior to abandonment.  Furthermore,
we do not consider the Baudoins' earlier mentioned, vague reference
to "Any possible claim against creditor for actions taken against
debtors prior to bankruptcy proceeding" in their schedule of assets
a sufficient scheduling of their claim against the Bank to
constitute abandonment under § 554(c).  In addition, we note that
the only debtors against whom wrongful pre-bankruptcy actions were
allegedly taken were not the Baudoins, in whose bankruptcies this
disclosure was made, but the corporation, RFBI.

[5]    The role of "discretion" in this context is unclear.  Perhaps
this refers to the bankruptcy judge's discussion of discretionary
abstention under 28 U.S.C. § 1334(a)(1).  Although he mentioned
that doctrine, he did not base his decision upon it.

*judicata* or judicial estoppel.[6] For the reasons that follow, we hold that the claim is precluded by the doctrine of *res judicata*; therefore, we need not reach estoppel.

A.

Our standard for reviewing a summary judgment is more than well settled. We conduct a *de novo* review of the entire record and determine whether there are any genuine issues of material fact. Finding none, we next decide whether the prevailing party is entitled to judgment as a matter of law. ***Stine v. Marathon Oil Co.***, 976 F.2d 254, 265 (5th Cir. 1992); Fed. R. Civ. P. 56.

Our review of the record in this case reveals no material fact disputes. Moving to the second prong, we reach legal conclusions contrary to those of the district court, and hold that the Bank, not the Baudoins, is entitled to judgment as a matter of law.

B.

"This Court has previously recognized the important interest in the finality of judgments in a bankruptcy case". ***Hendrick v. Avent***, 891 F.2d 583, 587 n.9 (5th Cir.), *cert. denied*, __ U.S. __, 111 S. Ct. 64 (1990). In promoting that interest, we have applied our traditional test for *res judicata* in the bankruptcy context: "An arrangement confirmed by a bankruptcy court has the effect of

---

[6]    The Bank also contends that the claim asserted in state court, which arose before bankruptcy, belongs to the estate of either RFBI or the Baudoins and thus, can be urged only by the trustee. The Baudoins conceded this point at oral argument. Indeed, their counsel stated that the trustee had been "substituted" as party plaintiff in state court. Our review of the record shows that the trustee has been added as a plaintiff, but has not replaced the Baudoins.

a judgment rendered by a district court. Any attempt by the parties to relitigate any of the matters that were raised *or could have been raised* therein is barred under the doctrine of *res judicata*." ***Matter of Brady***, 936 F.2d 212, 215 (5th Cir.), *cert. denied*, __ U.S. __, 112 S. Ct. 657 (1991). As stated by the Second Circuit in a case quite similar to this case, discussed *infra*, "[r]estraining litigious plaintiffs from taking more than `one bite of the apple' has been our avowed purpose since the common law doctrine of res judicata first evolved". ***Sure-Snap Corp. v. State Street Bank and Trust Co.***, 948 F.2d 869, 870 (2d Cir. 1991). Of course, in the bankruptcy context, especially a Chapter 7 liquidation, that bite is to be taken as expeditiously and economically as possible, to try to ensure, *inter alia*, that creditors get their share. After all, it has long been the "general spirit and purpose" of bankruptcy not only to release a bankrupt from the obligation to pay his debts, but also to "secure a just distribution of the bankrupt's property among his creditors". ***Wilson v. City Bank***, 84 U.S. (17 Wall.) 473, 480 (1872). In sum, the numerous and substantial reasons for the doctrine of *res judicata* are too well known, and obvious, to bear repeating. And, they are all the more compelling today, especially for bankruptcy, and related, proceedings. Because of spiraling litigation costs, increasingly congested courts -- especially bankruptcy courts -- and expanding theories of recovery, such as lender liability, it is more imperative than ever that the doctrine of *res judicata* be applied with unceasing vigilance.

Thus, a bankruptcy judgment bars a subsequent suit if: 1) both cases involve the same parties; 2) the prior judgment was rendered by a court of competent jurisdiction; 3) the prior decision was a final judgment on the merits; and 4) the same cause of action is at issue in both cases. *Latham v. Wells Fargo Bank, N.A.*, 896 F.2d 979, 983 (5th Cir. 1990). The parties agree that the first element is satisfied; they disagree on the other three.[7] We address them *seriatim*.

1.

The Baudoins and RFBI (appellees) contend that the lender liability suit is not a core proceeding and that, therefore, the bankruptcy court lacked jurisdiction in the prior bankruptcy proceedings to entertain the lender liability claim they raised later in state court. It is true that, if that claim was not "core", the bankruptcy court could not have entered a final judgment for it; instead, it could have only made proposed findings of fact and conclusions of law subject to *de novo* review by the

---

[7] The appellees' motion, carried with the case, to strike portions of the Bank's reply brief is **DENIED.**

district court.[8]  But, this does not mean that the bankruptcy court lacked jurisdiction to entertain the claim.

The wide reach of jurisdiction under title 11 was recognized in *Matter of Wood*, 825 F.2d 90, 92 (5th Cir. 1987):

> Legislative history indicates that the phrase [in 28 U.S.C. § 1334, *see* note 8 *supra*], "arising under title 11, or arising in or related to cases under title 11" was meant, not to distinguish between different matters, but to identify collectively a broad range of matters subject to the bankruptcy jurisdiction of federal courts. Congress was concerned with the inefficiencies of piecemeal adjudication of matters affecting the administration of bankruptcies and intended to give federal courts the power to adjudicate all matters having an effect on the bankruptcy.  Courts have recognized that the grant of jurisdiction under the 1978 Act was broad.

(Footnotes omitted.)  Indeed, pursuant to 28 U.S.C. § 157, bankruptcy jurisdiction exists if the matter is simply "related to" the bankruptcy -- if "the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy".  *Matter of Wood*, 825 F.2d at 93 (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)) (emphasis added by

---

[8]     District courts, under 28 U.S.C. § 1334, have original jurisdiction of "all civil proceedings arising under title 11, or arising in or related to cases under title 11".  Bankruptcy courts, though arms of the district court, do not have full power to adjudicate all matters over which the district court has jurisdiction.  Bankruptcy courts have full judicial authority over the bankruptcy petition itself and may "hear and determine ... all core proceedings ... and may enter appropriate orders and judgments" with regard to those proceedings.  28 U.S.C. § 157(b)(1).  They also have the limited power to "hear a proceeding that is not a core proceeding [and] submit proposed findings of fact and conclusions of law to the district court" for *de novo* review.  28 U.S.C. § 157(c)(1).

the **Wood** court).[9]  It cannot be reasonably argued that a $4,000,000

claim belonging to a bankruptcy estate could not have any

conceivable effect on that estate.  In short, the bankruptcy court

had jurisdiction to hear the lender liability claim.  Because, as

discussed next, we hold that the jurisdiction was "core" in this

---

[9]     The **Wood** court noted that references to proceedings "arising under", "arising in a case under" (core) and "related to a case under" (non-core) operate conjunctively to define the scope of bankruptcy jurisdiction. **Wood**, 825 F.2d at 93.  28 U.S.C. § 157(a) allows a district court to refer any or all such cases to the bankruptcy court.  Core matters, those "arising under title 11, or arising in a case under title 11" may be finally decided by the bankruptcy court, 28 U.S.C. § 157(b)(1), and the district court sits as an appellate court regarding those matters.  28 U.S.C. § 158.

Section 157(b)(2) reads in part:

> Core proceedings include,  but are not limited to --
>
> (A)  matters concerning the administration of the estate;
>
> (B)  allowance or disallowance of claims against the estate ...;
>
> (C)  counterclaims by the estate against persons filing claims against the estate;
>
> . . .
>
> (O)  other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor ... relationship, except personal injury tort or wrongful death claims.

The bankruptcy judge is to determine whether a proceeding is core or non-core, but "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law".  28 U.S.C. § 157(b)(3).

case, we need not decide whether it must be so in order to satisfy this second prong of our *res judicata* analysis.[10]

As quoted in note 9, *supra*, 28 U.S.C. § 157(b)(2) is a non-exclusive list of matters which are "core". It includes "counterclaims by the estate against persons filing claims against the estate", § 157(b)(2)(C), and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor ... relationship", § 157(b)(2)(O). As hereinafter discussed, the lender liability claim at issue would have been a § 157(b)(2) "core proceeding" in both prior bankruptcy actions: in the corporate (RFBI) bankruptcy, under § 157(b)(2)(C), and in the personal bankruptcies, under § 157(b)(2)(O).

In the RFBI bankruptcy, the Bank filed a proof of claim, based on the loans it made to the corporation. The Baudoins' lender

---

[10] In ***Latham v. Wells Fargo Bank, N.A.***, 896 F.2d 979 (5th Cir. 1990), this court held that neither confirmation of a corporation's Chapter 11 plan nor an order authorizing the auction of another corporation's lender liability claims in its Chapter 7 proceeding barred a subsequent lender liability suit against creditors brought by the non-bankrupt, sole shareholder, but only in his capacity as co-borrower and guarantor of the corporations' loans. To the extent that his claims were those of a shareholder, they were barred. The court stated that "if [the shareholder's] personal claims against the banks would not have presented a core proceeding in [the corporations'] bankruptcy proceedings, his personal interests could not have been properly placed before that court for decision." ***Id***. at 984. It went on to say, however, that there was a "strong argument" that if the shareholder had participated in the auction or formulation of the Chapter 11 plan and "in the process compromised his personal claims", the orders confirming the plan and authorizing the auction may have barred his subsequent claims. The ***Latham*** court was simply saying that the shareholder's personal claims could not have been effectively litigated in the corporations' bankruptcies. Nor do we read this to hold that bankruptcy jurisdiction must always be core in order to be "competent" for *res judicata* purposes.

liability suit alleges violation of these very loan agreements. If it believed that the agreements had been breached, RFBI could, and should, have filed an objection to that proof of claim, asserting a lender liability "counterclaim". A response to a proof of claim which is, in essence, a counterclaim, is a core proceeding under 28 U.S.C. § 157(b)(2)(C). *See In re Bedford Computer Corp.*, 61 B.R. 594 (Bankr. D.N.H. 1986); *Interconnect Telephone Services v. Farren*, 59 B.R. 397 (S.D.N.Y. 1986); *In re Bar M Petroleum Co.*, 63 B.R. 343 (Bankr. W.D. Tex. 1986).

In the personal bankruptcies, the Baudoins listed the Bank as a creditor in their original Chapter 7 petition. The Bank filed no proof of claim. The orders asserted here as carrying preclusive effect are those ordering and confirming the sale of the Baudoins' properties in Lafayette and Grand Coteau. The Bank held a first mortgage on the latter and a second mortgage on the former. Both tracts were purchased by the Bank for the "price" of cancellation of the existing debt.[11] If the Baudoins were, as they allege in their lender liability suit in state court, "forced" into bankruptcy by the Bank, they could, and should, have asserted that claim in their personal bankruptcy by objecting to the Bank's purchase of their property (by "trading in" its mortgages) and the subsequent ratification of those sales. While we recognize that § 157(b)(2)(O) is to be narrowly construed, we are confident that the Baudoins' claim is precisely the type which fits within the catch-

---

[11] As noted, the Bank did pay off the first lien on the Lafayette property and may have paid a very small additional amount in cash.

12

all provision's narrow ambit.  It would "affect[] the liquidation of the assets of the estate or the adjustment of the debtor-creditor ... relationship" tremendously.  *See **In re Branding Iron Motel***, 798 F.2d 396, 399 n.3 (10th Cir. 1986) (noting that a controversy over a note and mortgage is "inextricably tied to the bankruptcy proceeding because it affects the liquidation of assets" and is, therefore, core).[12]

We hold that the Baudoins' lender liability claim falls squarely within the provisions of 28 U.S.C. § 157(b)(2) and, as such, would have been a "core proceeding" in both the corporate and personal bankruptcies.

2.

Continuing our *res judicata* analysis, we next look to the finality of the prior judgments.[13]  Our precedent clearly

_____

[12] We note, too, that, in a similar vein, the Eighth Circuit recently affirmed a bankruptcy court's denial of a debtor's request to file a fraud claim against one of its creditors in state court. The fraud claim was held "core" to the bankruptcy, because it "strikes at the heart of the debtor-creditor relationship".  ***In re Tranel***, 940 F.2d 1168, 1174 (8th Cir. 1991) (citing ***Howell Hydrocarbons, Inc. v. Adams***, 897 F.2d 183 (5th Cir. 1990)).

[13] There is disagreement about which judgments are at issue.  The Baudoins and RFBI present their case from the position that the judgment claimed as preclusive by the Bank is that which modified the automatic stay and allowed the Bank to foreclose on RFBI's accounts receivable.  The Bank, however, has never based its preclusion claim on that judgment.  Thus, we find inapplicable the case relied on by the Baudoins, ***D-1 Enterprises, Inc. v. Commercial State Bank***, 864 F.2d 36, 39 (5th Cir. 1989) ("The lender liability claims asserted in the adversary proceeding at issue in this case were not ... `direct defenses' that the debtor could or should have litigated in response to the creditor's motion for relief from the stay.").  The Bank asserts, instead, that the Baudoins' claim is barred by the judgments ordering and confirming the sale of real estate in the Baudoins' personal bankruptcies, and allowing the Bank's proof of claim in the RFBI corporate bankruptcy.  We will

13

establishes that bankruptcy court orders authorizing the sale of part of the estate or confirming such sale are final judgments on the merits for *res judicata* purposes, "even though the order neither closes the bankruptcy case nor disposes of any claim". **Hendrick v. Avent**, 891 F.2d at 586; *see also* **Southmark Properties v. Charles House Corp**., 742 F.2d 862, 870 (5th Cir. 1984). Though perhaps less clearly, we read our prior holdings to establish that an order allowing a proof of claim is, likewise, a final judgment.[14] *See* **Matter of Colley**, 814 F.2d 1008, 1010 (5th Cir.), *cert. denied*, 484 U.S. 898 (1987).[15]

### 3.

Finally, we examine the identity of the causes of action. This court has adopted the "transactional test" for deciding whether two cases involve the same cause of action for *res judicata* purposes. Under this test, "the critical issue is ... whether ...

---

analyze only the preclusive effect of those judgments asserted by the Bank as *res judicata*.

[14] As noted, the Baudoins' personal bankruptcies have been reopened. And, the RFBI bankruptcy has remained open. (As aptly noted by Judge Jones for our court in **Matter of Colley**, 814 F.2d 1008, 1009 (5th Cir.), *cert. denied*, 484 U.S. 898 (1987), "old bankruptcy cases, like old soldiers, never die".) This fact may raise questions about the finality of the discharge order and the order allowing the Bank's proof of claim. But, in any event, and as discussed *supra*, the judgments ordering and confirming sale of the estate's properties are, in and of themselves, sufficient to render the Baudoins' lender liability claim barred by *res judicata*.

[15] **Colley** is a Chapter 13 case. In the case before us, of course, the judgments asserted as preclusive arose in the context of Chapter 7 bankruptcies. However, the allowance of a proof of claim in a Chapter 13 case is no more "final" than such allowance in a Chapter 7, as the Code provisions governing proofs of claim, 11 U.S.C. §§ 501-02, apply equally to cases filed under Chapters 7, 11, 12 and 13. 11 U.S.C. § 103(a).

14

the two actions [are based] on the same nucleus of operative facts". *Matter of Howe*, 913 F.2d 1138, 1144 (5th Cir. 1990).

We consider each prior judgment separately. First, the bankruptcy court's orders authorizing and confirming the sale of the properties securing the personal and corporate loans involved the same facts at issue in the Baudoins' state court action. We have previously held that a court ordered public auction where a creditor is allowed to bid the full amount of its debt "necessarily determine[s] not only that the amount bid [is] actually owing, but also that the maturity of the debt has been validly accelerated". *Hendrick*, 891 F.2d at 587 (interpreting *Southmark Properties v. Charles House Corp.*, 742 F.2d 862 (5th Cir. 1984)). In their lender liability action, the Baudoins contend, *inter alia*, that the Bank wrongfully attempted to collect on notes which were not due. If the Bank's actions to recover amounts owed by the Baudoins or RFBI violated the loan agreements, that position could, and most certainly should, have been asserted in conjunction with the Bank obtaining the property through the public auction. Of course, as discussed earlier, a claim or defense which could have been, but was not, asserted is still the "same claim" for purposes of *res judicata*. *See* **Hendrick**, 891 F.2d at 587.

The bankruptcy court's order allowing the Bank's proof of claim in the RFBI bankruptcy also involved the "same claim" the Baudoins are asserting now in state court, because the lender liability claim might have also been asserted in response to that proof of claim. The Baudoins contend that the same "nucleus of

15

operative facts" was not addressed by the bankruptcy court in allowing the Bank's claim, because the Baudoins are not challenging their obligation to the Bank on RFBI's loans: "Instead, the Baudoins claim that the bank breached its duty of good faith, which, while not resulting in extinguishment of the Baudoins' obligation to repay the indebtedness, makes Bank of Lafayette liable to the Baudoins in damages".[16] But this begs the question. The issue is not what effect the present claim might have had on the earlier one, but whether the same facts are involved in both cases, so that the present claim could have been effectively litigated with the prior one. Here, the only remaining ground for the Baudoins' lender liability suit is breach of contract. The contracts at issue are the very loan agreements which were the basis of the Bank's proof of claim in the prior bankruptcy. It is difficult to imagine a more common nucleus of operative facts.

This distinction urged by the Baudoins is the very one rejected by our court in *Matter of Howe*, 913 F.2d 1138 (5th Cir. 1990), and *Eubanks v. F.D.I.C.*, 977 F.2d 166 (5th Cir. 1992). Those cases both involved Chapter 11 debtors who filed lender

---

[16] In support of this distinction, the Baudoins contend that none of their claims could have been asserted as defenses to the Bank's foreclosure on the mortgages after modification of the automatic stay. Again, this is a misstatement of the facts and of the Bank's basis for its assertion of *res judicata*. The Bank's acquisition of the Grand Coteau and Lafayette properties did not result from foreclosure and had nothing to do with modification of the stay. Rather, the Bank purchased those properties by "trading in" its lien at a public auction which was conducted at the request of Mr. Sandoz, the trustee. The automatic stay was modified after the public auction and for the sole purpose of allowing the Bank to foreclose on RFBI's accounts receivable.

16

liability claims against creditor banks after confirmation of the Chapter 11 plans. In *Howe*, the claim was filed five years later and alleged that the bank had driven Howe to financial ruin. In *Eubanks*, the claim was filed six months after confirmation and alleged, *inter alia*, breach of a loan contract. As here, the banks' loans to the debtors had been specifically addressed as allowed claims in the respective bankruptcies. As here, the debtors' lender liability claims had not been scheduled as assets of the estate. The court noted in *Howe*, as we do here, that "[t]he loan transaction at the heart of the present litigation was also the source of [the bank's] claim against the estate". *Howe*, 913 F.2d at 1144. As such, both the *Howe* and *Eubanks* courts held the lender liability claims to be the "same" as the bankruptcies for purposes of *res judicata*.

The Second Circuit also reached the same conclusion in the Chapter 11 context in *Sure-Snap Corp.*, which relies in large part on our court's decisions in *Matter of Howe*, *Southmark Properties*, and *Hendrick v. Avent*, and which is discussed at length in our recent decision in *Eubanks*, 977 F.2d at 171-72. The *Sure-Snap* debtor brought lender liability claims against two creditor banks one year after confirmation of the reorganization plan, and the claims were held barred by *res judicata*.

Like the Baudoins, the *Sure-Snap* debtor attempted to distinguish the bankruptcy judgment as a decision addressing only the creditors' right to be paid. Calling this characterization "excessively narrow", the Second Circuit held that the bankruptcy

17

proceeding encompasses the entire debtor-creditor relationship: not only the creation of that relationship through the initial loan but also the bank's actions in calling that loan early -- the act which the debtor claimed "forced" him into bankruptcy. *Sure-Snap*, 948 F.2d at 874-75. Thus, the debtor's "very allegation that the banks' ... conduct negatively influenced their business's health, makes it hard-pressed to explain how the two causes of action -- the plan of reorganization and the lender liability claims -- did not comprise the same essential matter". *Id.* at 875. Likewise, the Baudoins are "hard pressed" to distinguish their lender liability claim from the prior judgments of the bankruptcy court. In fact, they have been unable to do so; and we hold that their current claim is identical to those disposed of in the prior bankruptcies.

## III.

All elements for application of *res judicata* having been established, the Baudoins' lender liability claim is barred by that doctrine. Accordingly, the judgment is **REVERSED** and, instead, **RENDERED** for the Bank; and this case is **REMANDED** to the district court for entry of the appropriate injunctive or other relief.

**REVERSED, RENDERED, and REMANDED.**