Patricia MROZEK and Plover Motel, Inc., Plaintiffs-Appellants,†

v.

INTRA FINANCIAL CORPORATION and James Graves, Defendants,

MALLERY & ZIMMERMAN, S.C., Defendant-Respondent.

Court of Appeals

*No. 02–2448. Submitted on briefs May 14, 2003.—Decided February 26, 2004.*

2004 WI App 43

(Also reported in 678 N.W.2d 264.)

† Petition to review filed.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *William P. Skemp* of *William Skemp Law Firm, S.C.*, La Crosse.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Ross A. Anderson* and *James P. Denis III* of *Whyte Hirschboeck Dudek, S.C.*, Milwaukee.

Before Deininger, P.J., Vergeront and Lundsten, JJ.

¶ 1. DEININGER, P.J.   Patricia Mrozek and Plover Motel, Inc. (PMI) appeal a judgment dismissing their complaint against Mallery & Zimmerman, S.C. Mrozek and PMI alleged that they suffered damages on account of the defendant law firm's negligent rendition of legal services. We conclude that issue preclusion, public policy, and the lack of evidence tending to show that PMI suffered future lost profits, entitle the Mallery firm to summary judgment on Mrozek's claims as

an individual. We also conclude that claim preclusion bars PMI's malpractice action against the firm. Accordingly, we affirm the circuit court's dismissal of the complaint on summary judgment.

## BACKGROUND

¶ 2.   Patricia Mrozek, a financial advisor and licensed securities agent, retained the services of Mallery & Zimmerman, S.C. in 1992 to assist her in forming a corporation, "Plover Motel, Inc.," the sole purpose of which was to construct and operate an AmericInn franchise motel in Plover, Wisconsin. Mrozek estimated the cost of the project at approximately $2.8 million and, although she had no financing at the time PMI was formed, she intended to acquire the necessary funds through both a private stock offering and an institutional loan.

¶ 3.   Shortly after hiring the Mallery firm, Mrozek began soliciting investments in the project from local citizens. Between August 1992 and February 1993, she obtained loans for the project from some twenty or more individuals totaling over $500,000. Mrozek represented to investors that the loans would be used for the construction of the Plover motel, the operation of which would ultimately generate the promised ten percent return on their investment. Each investor received a note promising that PMI would repay the principal of the loan, plus interest, within a specified time period. Most of the original promissory notes were subsequently replaced with mortgage notes. Mortgages securing the notes were recorded with the Portage County Register of Deeds.

¶ 4.   While still in the process of raising funds from individual investors, and without having acquired institutional financing, Mrozek and PMI hired a gen-

eral contractor and broke ground on the motel.[1] When construction and related costs depleted the $500,000 in initial investments, the general contractor filed construction liens against the property and initiated a lawsuit to collect unpaid bills and foreclose its liens.

¶ 5. During the time that Mrozek was engaged in obtaining loans and issuing PMI's notes to individual investors, she agreed to the voluntary revocation of her securities agent license by the Wisconsin Commissioner of Securities for her actions in the sale of unrelated investments. Also during this time, the Mallery firm prepared a private placement memorandum on behalf of Mrozek for the sale of shares in PMI and filed it with the commissioner's office for approval. The commissioner immediately rejected the memorandum because it incorrectly represented that Mrozek held a securities agent license. The commissioner accepted a revised offering memorandum and issued an exemption containing stringent "investor suitability standards" that restricted investors to those meeting certain net worth and income requirements.

¶ 6. No investors meeting the requirements for purchasing shares of PMI were found and, in late 1993, the commissioner revoked the exemption for the sale of PMI stock. Shortly thereafter, the Mallery firm withdrew from representing Mrozek and PMI.

¶ 7. At about the same time, the Portage County District Attorney, at the request of the commissioner's

---

[1] Plover Motel, Inc. (PMI) executed a design-build construction contract with Intra Financial Corporation (IFC). Both IFC and James Graves, an individual affiliated with IFC, were originally named as defendants in this litigation but were subsequently dismissed as parties, apparently by stipulation. None of Mrozek's and PMI's claims against IFC or Graves are at issue in this appeal.

office, filed criminal charges against Mrozek alleging thirteen felony counts of willfully failing to disclose material facts in connection with PMI's issuance of the mortgage notes for the motel project. *See* WIS. STAT. § 551.41(2) (2001–02).[2] Pursuant to a plea agreement, Mrozek pled guilty in 1995 to two counts of felony securities fraud under § 551.41(2) and to three counts of misdemeanor theft by fraud, WIS. STAT. § 943.20(1)(d).[3] The court placed her on probation for the misdemeanor theft convictions, with jail time and restitution as conditions. Judgment on the felonies was withheld pursuant to a deferral agreement between Mrozek and the State.

¶ 8. Lacking adequate funding to pay outstanding construction bills and complete the motel project, PMI filed a voluntary Chapter 11 bankruptcy petition in 1994. The bankruptcy filing forestalled a pending sheriff's sale of the motel property that had been ordered in the contractor's lien foreclosure action.

---

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted. WISCONSIN STAT. § 551.41(2) makes it unlawful in connection with the offer, sale, or purchase of securities, "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." The criminal complaint alleged that Mrozek violated § 551.41(2) by failing to inform each investor that: (1) the commissioner had revoked her securities agent license; (2) a Notice of Intention to File for Lien had been filed against PMI by IFC; and (3) PMI had not secured financing for construction from any source other than the individual investors.

[3] WISCONSIN STAT. § 943.20(1)(d) makes it unlawful to "[o]btain[ ] title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made."

Schedules that PMI filed with its bankruptcy petition listed a claim against the Mallery firm for professional negligence as an asset of the corporation, and also identified the firm as an unsecured creditor of the corporation for its unpaid legal bills. Pursuant to a stipulation entered into and approved during the Chapter 11 proceedings, the motel property and AmericInn franchise rights were transferred to the contractor, who in turn transferred them to another corporation that operated the motel thereafter.

¶ 9.  The contractor then filed a motion to convert the bankruptcy from Chapter 11 to a Chapter 7 liquidation, asserting that "[b]ecause [PMI] no longer owns the Property," [PMI] has no assets of substance, no business, no income, cannot generate funds to pay various expenses, and is completely unable to effectuate a [reorganization] plan," as required under Chapter 11. The bankruptcy court granted the motion over PMI's objection. The court appointed a trustee for the bankruptcy estate who would, in the words of the bankruptcy judge, "review the situation and determine . . . whether there were any assets which should be pursued." The trustee chose not to pursue the scheduled claim against the Mallery firm but did pursue a claim, albeit unsuccessfully, against the contractor for "disgorgement" of excess profits. The trustee subsequently reported to the court that, after "diligent inquiry," there were "no assets in the estate" that were not either "inconsequential in value or burdensome to the estate." The trustee's report also recited that it constituted an "abandonment of all scheduled property of the bankruptcy estate," and the estate was ordered closed.

¶ 10.  Mrozek and PMI thereafter commenced this action against the Mallery firm, alleging in an amended complaint that the firm was negligent in its legal

representation of both Mrozek and PMI, and that the firm also breached fiduciary duties owed to them.[4] The circuit court granted summary judgment to the Mallery firm on Mrozek's claim, concluding that her guilty plea precluded her from pursuing a malpractice claim against the Mallery firm for any damages arising out of her criminal conviction. The trial court also granted summary judgment dismissing PMI's negligence claim against the law firm after concluding that the doctrine of claim preclusion prevented PMI from relitigating a claim that could have been raised and resolved as a part of the bankruptcy proceedings. Finally, the trial court concluded that neither PMI nor Mrozek had made sufficient evidentiary submissions to support a claim for damages based on future lost profits. Mrozek and PMI appeal the dismissal of their claims.

## ANALYSIS

¶ 11.   We review an order for summary judgment de novo, applying the same standards as the trial court. *See Voss v. City of Middleton*, 162 Wis. 2d 737, 748, 470 N.W.2d 625 (1991). Summary judgment is proper when the pleadings, answers, admissions and affidavits show no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Maynard v. Port Publ'ns, Inc.*, 98 Wis. 2d 555, 558, 297 N.W.2d 500

---

[4] Mrozek and PMI refer on appeal only to their "malpractice claim" against the Mallery firm. They make no separate argument that their claims based on alleged breaches of the firm's fiduciary duties should survive summary judgment even if their professional negligence claims do not. Accordingly, we do not consider that possibility and, like the parties, refer in this opinion to the claims against the law firm as alleging professional negligence.

(1980). We will reverse a decision granting summary judgment if the trial court incorrectly decided legal issues or if material facts were in dispute. *Coopman v. State Farm Fire & Cas. Co.*, 179 Wis. 2d 548, 555, 508 N.W.2d 610 (Ct. App. 1993). Even if certain facts are in dispute, the dispute will not prevent the granting of summary judgment if the facts at issue are "not material to the legal issue on which summary judgment is sought." *Tackes v. Milwaukee Carpenters Health Fund*, 164 Wis. 2d 707, 711, 476 N.W.2d 311 (Ct. App. 1991).

¶ 12.   To prevail in an action for legal malpractice, a plaintiff must prove four elements:   (1) the existence of a lawyer-client relationship; (2) the acts or omissions constituting negligence; (3) that the attorney's negligence caused the plaintiff injury; and (4) the nature and extent of injury. *See Lewandowski v. Continental Cas. Co.*, 88 Wis. 2d 271, 277, 276 N.W.2d 284 (1979). Mrozek and PMI bear the burden of establishing these four elements in order to recover on their malpractice claims against the Mallery firm. Thus, in order for their claims to survive summary judgment, it was incumbent on them " 'to make a showing sufficient to establish the existence of [each] element essential' " to their case. *See Transportation Ins. Co., Inc. v. Hunzinger Constr. Co.*, 179 Wis. 2d 281, 291–92, 507 N.W.2d 136 (Ct. App. 1993) (citation omitted).

I.

¶ 13.   We begin with Mrozek's claim that she, personally, suffered damages on account of the law firm's negligence in two ways:   (1) she was charged and convicted of several crimes, thereby incurring legal fees, losing wages due to incarceration, and being

497

ordered to make restitution to all note holders; and (2) she "lost profits as manager of the motel." Mrozek argues that numerous factual disputes over the nature, extent and quality of the Mallery firm's legal representation preclude summary judgment in the firm's favor.[5] The disputed facts to which Mrozek points, however, are not material to the issues on which the Mallery firm sought summary judgment. It is undisputed that Mrozek pled guilty to three counts of theft by fraud. We conclude that this fact is dispositive and entitles the Mallery firm to dismissal of Mrozek's claim for any damages she suffered stemming from her criminal prosecution and convictions. Additionally, as we discuss in section II of this opinion, the failure of Mrozek and PMI to make a sufficient showing on summary judgment that their operation of the motel would have generated profits disposes of the remainder of Mrozek's individual claim against the law firm.

¶ 14. The Mallery firm argues that Mrozek's guilty pleas and resulting criminal convictions preclude her from satisfying the essential element of causation in this action, that is, that the firm's alleged negligence caused her to suffer damages arising from her prosecu-

---

[5] Mrozek contends that the following facts are disputed: (1) when Mrozek actually retained the Mallery firm; (2) whether the firm represented Mrozek individually in addition to PMI; (3) when the firm became aware of the individual investor loans and whether the firm was involved in the drafting of the promissory notes; (4) whether the firm properly advised Mrozek with regard to possible violations of Wisconsin securities law inherent in her methods of soliciting investors; and (5) whether the firm was aware that Mrozek had surrendered her securities licenses at the time the firm submitted the private stock offering memorandum to the Office of the Wisconsin Commissioner of Securities.

tion and convictions. The law firm does not articulate its position in terms of the doctrine of issue preclusion, and the trial court did not analyze the issue in those terms when making its oral ruling granting the firm's summary judgment motion. We conclude, however, that the first step in our analysis must be to address whether Mrozek's guilty plea and resulting conviction in the criminal case may serve as a basis to preclude her from litigating in this action any questions of law or fact that were determined by the criminal judgment. In other words, we must decide whether the doctrine of issue preclusion may be applied against Mrozek in the present action.

¶ 15.   Issue preclusion, formerly called "collateral estoppel," refers to "the effect of a judgment in foreclosing relitigation in a subsequent action of an issue of law or fact that has actually been litigated and decided in a prior action." *Northern States Power Co. v. Bugher*, 189 Wis. 2d 541, 550–51, 525 N.W.2d 723 (1995). The ultimate decision whether to apply issue preclusion in a given case, thereby preventing a party from relitigating an issue that he or she previously litigated and lost, is, for the most part, a discretionary determination. *Paige K.B. v. Steven G.B.*, 226 Wis. 2d 210, 219–23, 594 N.W.2d 370 (1999). The determination rests on an analysis of the "fundamental fairness" of applying issue preclusion and involves the consideration of a number of factors. *Id.* at 220–21; *Michelle T. v. Crozier*, 173 Wis. 2d 681, 688–89, 495 N.W.2d 327 (1993).

¶ 16.   Before considering whether it is "fundamentally fair" to apply issue preclusion against a party in a given case, however, a court must determine whether certain threshold requirements for applying issue pre-

clusion are present. Among them is a requirement that the legal or factual issue in question must have been "actually litigated" in the prior action. *Deminsky v. Arlington Plastics Mach.*, 2001 WI App 287, ¶ 39, 249 Wis. 2d 441, 638 N.W.2d 331, *aff'd as modified*, 2003 WI 15, 259 Wis. 2d 587, 657 N.W.2d 411. Here, we must decide whether the nature of Mrozek's conduct that resulted in her being convicted of several crimes was actually litigated in the criminal proceedings, given that her conviction rests on guilty pleas as opposed to findings of a judge or jury. Whether an issue has been "actually litigated" in a prior proceeding is a question of law that we decide de novo. *See Heggy v. Grutzner*, 156 Wis. 2d 186, 192–93, 456 N.W.2d 845 (Ct. App. 1990).[6]

¶ 17.   No Wisconsin court has been asked to decide whether a guilty plea satisfies the "actually litigated" requirement for applying issue preclusion. For the reasons discussed below, we conclude that a convicted party may be precluded from relitigating in a subsequent civil proceeding any factual or legal issue that is necessarily determined by the judgment of criminal conviction, provided:   (1) the guilty plea is knowingly and voluntarily entered; (2) the criminal court ascertains that a factual basis exists for the plea; and (3) the court accepts the plea and enters a judgment of conviction.

---

[6] The Mallery firm was, of course, not a party to the criminal action against Mrozek. However, issue preclusion may be "asserted defensively to prevent a party from relitigating an issue which has been conclusively resolved against that party in a prior case," even when the party asserting preclusion was *not* a party in the prior case. *Crowall v. Heritage Mut. Ins. Co.*, 118 Wis. 2d 120, 125, 346 N.W.2d 327 (Ct. App. 1984).

¶ 18.   We held in *Crowall v. Heritage Mutual Insurance Co.*, 118 Wis. 2d 120, 346 N.W.2d 327 (Ct. App. 1984), that "a fully litigated criminal conviction can . . . be used for [issue preclusion] purposes." *Id.* at 122. We also said in a footnote that "[a] plea of guilty or nolo contendere in the criminal suit does not draw any issues into controversy and does not support the use of [issue preclusion]." *Id.* at 122 n.2. We conclude, however, that our footnoted comment is not controlling precedent. The issue we decided in *Crowall* was whether a criminal conviction based on a jury verdict could be used defensively to preclude the convicted defendant from pursuing a civil claim whose success depended on relitigating an issue that "had already been resolved against" the defendant in the criminal proceeding. *Id.* at 121. Because the question before us now was not presented by the facts in *Crowall*, we had no reason to address whether a judgment based on a guilty plea can be said to meet the "actually litigated" requirement for applying issue preclusion. We, like the supreme court,[7] view our *Crowall* footnote as dicta.

---

[7] Our conclusion that we are not bound by the *Crowall* footnote finds support in *Michelle T. v. Crozier*, 173 Wis. 2d 681, 495 N.W.2d 327 (1993), where the supreme court labeled our comment "dicta." In a footnote of its own, the court said this:

> We note that the court of appeals in *Crowall* . . . states that '[a] plea of guilty or nolo contendere in the criminal suit does not draw any issues into controversy and does not support the use of collateral estoppel.' We are not confronted with this problem in this case. Accordingly, we do not by relying generally on the principle [sic] holding of *Crowall* give our imprimatur to the dicta set forth in that footnote.

*Id.* at 688 n.7.

¶ 19. Various jurisdictions that have addressed the question have resolved it differently. *See James v. Paul*, 49 S.W.3d 678, 686–88 (Mo. 2001) (listing cases and observing that jurisdictions "have split fairly evenly, the recent trend being to apply [issue preclusion] defensively in a civil proceeding following a plea of guilty"). We find persuasive the reasoning in *James*, as well as that in *Ideal Mutual Insurance Co. v. Winker*, 319 N.W.2d 289, 294–96 (Iowa 1982), where the courts permitted the application of issue preclusion to convictions based on guilty pleas. The Iowa and Missouri courts recognized that, as in Wisconsin, conviction on a guilty plea requires there to be an evidentiary basis for the plea, that is, the criminal court must examine the facts and determine that they are sufficient to support the essential elements of the crime. *James*, 49 S.W.3d at 687; *Ideal Mutual*, 319 N.W.2d at 295.

¶ 20. Wisconsin statutes and case law require a criminal court to make sufficient inquiries before accepting a guilty plea to ensure the validity and integrity of the tendered plea. For example, WIS. STAT. § 971.08(1) provides in part as follows:

**(1)** Before the court accepts a plea of guilty or no contest, it shall do all of the following:

(a) Address the defendant personally and determine that the plea is made voluntarily with understanding of the nature of the charge and the potential punishment if convicted.

(b) Make such inquiry as satisfies it that the defendant in fact committed the crime charged.

*See also State v. Bangert*, 131 Wis. 2d 246, 266–67, 389 N.W.2d 12 (1986). It is clear that before a Wisconsin criminal court may accept a guilty plea, it must deter-

mine that the defendant's admitted conduct constitutes the offense to which the defendant has pled guilty. *State v. Johnson*, 200 Wis. 2d 704, 708, 548 N.W.2d 91 (Ct. App. 1996). We conclude that the judicial determination of the existence of a factual basis for a guilty plea, together with a court's finding that the plea was entered knowingly and voluntarily, are sufficient to satisfy the requirement that issues be actually litigated in order for issue preclusion to be applied.

¶ 21. The minutes of Mrozek's plea hearing indicate that, after finding her pleas were entered knowingly, freely, and voluntarily, the criminal court accepted Mrozek's guilty pleas to three counts of misdemeanor theft by fraud, Wis. Stat. § 943.20(1)(d), and two counts of securities fraud, Wis. Stat. § 551.41(2).[8] There is nothing in the present record to suggest that Mrozek's pleas were involuntary or unknowing, or that the facts alleged by the State were insufficient to support the crimes charged. Given the lack of any indication in the record (or, any assertion by Mrozek) to the contrary, we must assume that the criminal court complied in all respects with the requirements of Wis. Stat. § 971.08(1) and case law for accepting guilty pleas, including the requirement that it

---

[8] The minutes reflect that the court conducted a typical plea colloquy with Mrozek:

Court questions the defendant with regard to her plea. Defendant has filed a Plea Questionnaire/Waiver of Rights. Court questions her with regard to the form. Court informs Defendant of Constitutional Rights.

The minutes also indicate that, after the court found the pleas to be "knowingly, freely and voluntarily" made, the prosecutor and defense counsel made "further statements as to additional facts regarding this matter."

determine a factual basis existed to believe the defendant committed the crimes to which she pled. We thus conclude that Mrozek may be precluded from relitigating in this action any issues of fact or law necessarily encompassed by the judgment convicting her of theft by fraud, provided it is "fundamentally fair" to do so, a question we address below.[9]

¶ 22. Although she does not expressly renew the argument on appeal, Mrozek asserted in the trial court that she entered the pleas pursuant to a plea agreement that purportedly required her to pursue the present lawsuit in order to make restitution to the defrauded investors. Mrozek provided neither a transcript of the plea and sentencing hearing nor a copy of the deferred conviction agreement for the record in this appeal. The hearing minutes make no mention of a potential future lawsuit against the Mallery firm, reflecting only that Mrozek, as a condition of her probation, is to "make full restitution pursuant to the plea agreement and the Deferred Prosecution Agreement." There is thus no support in the record for Mrozek's suggestion that her guilty pleas were conditioned in some way on the viability of her present claim against the Mallery firm.[10]

---

[9] A judgment of conviction on the misdemeanors was entered immediately, and the court placed Mrozek on probation, ordering as conditions the payment of restitution and jail time. The two felonies, however, were the subject of a deferred conviction agreement, whereby no judgment would be entered on Mrozek's guilty pleas provided she complied with the conditions specified in the agreement. Because no judgment of conviction was entered on the securities offenses, we consider here only the effect of Mrozek's convictions for three counts of theft by fraud.

[10] The record before us contains only the following items from Mrozek's criminal case: (1) the original criminal com-

¶ 23.   The record, however, does contain Mrozek's affidavit in opposition to summary judgment, in which she averred that she

> entered into a plea agreement with regard to [the criminal complaint] because she felt that it was in her best interest to do so, in light of the fact that by doing so she had an opportunity to make restitution on the allegations made, and that in order to avoid extensive defense costs and time and potential for severe penalty, she felt if she had the opportunity to rehabilitate herself with regard to these charges.

This statement indicates nothing more than that Mrozek made a cost-benefit analysis with regard to the advisability of entering guilty pleas. She makes no claim in the affidavit that she was induced to plead guilty because she believed that doing so would allow her to sue the Mallery firm. Neither does Mrozek's affidavit set forth any facts that would suggest her pleas were the result of anything other than her free and knowing decision to enter them.

¶ 24.   We turn next to the question whether it is "fundamentally fair" to apply the doctrine of issue preclusion in this case. As we have noted, case law has identified certain "fundamental fairness" factors for a court to consider when exercising its discretion whether to apply issue preclusion. *See Paige K.B.*, 226 Wis. 2d at 225 (noting that whether to apply issue preclusion to a litigant in a given case is generally a discretionary

plaint; (2) Mrozek's guilty plea/waiver form; (3) the judgment of conviction; and (4) the minutes of the plea and sentencing hearing. No transcript of the criminal proceedings appears in this record, and apparently none was provided to the trial court. An appellant has the duty to ensure that the record is sufficient to review the issues raised on appeal. *State Bank of Hartland v. Arndt*, 129 Wis. 2d 411, 423, 385 N.W.2d 219 (Ct. App. 1986).

determination but certain factors present questions of law). We will uphold a trial court's discretionary ruling if it appears from the record that the court applied the proper legal standards to the facts before it, and through a process of reasoning, reached a result which a reasonable judge could reach. *Loy v. Bunderson*, 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982).

¶ 25. The fairness factors are: (1) could the party against whom preclusion is sought, as a matter of law, have obtained review of the judgment; (2) is the question one of law that involves two distinct claims or intervening contextual shifts in the law; (3) do significant differences in the quality or extensiveness of proceedings between the two courts warrant relitigation of the issue; (4) have the burdens of persuasion shifted such that the party seeking preclusion had a lower burden of persuasion in the first trial than in the second; and (5) are matters of public policy and individual circumstances involved that would render the application of collateral estoppel to be fundamentally unfair, including inadequate opportunity or incentive to obtain a full and fair adjudication in the initial action. *Michelle T.*, 173 Wis. 2d at 688–89.

¶ 26. A difficulty we face in reviewing the trial court's exercise of discretion in this case is that neither of the parties argued the present issue in the trial court in terms of the doctrine of issue preclusion (nor do they do so on appeal). It is not surprising, therefore, that the trial court did not recite and review the "fairness factors" as set forth in *Michelle T.* However, we may affirm a trial court's discretionary determination if the record shows that discretion was in fact exercised, and if our review of the record satisfies us that it provides a

basis for the trial court's decision. *See State v. Pharr*, 115 Wis. 2d 334, 343, 340 N.W.2d 498 (1983).

¶ 27.   Our review of the trial court's oral ruling satisfies us that the trial court did exercise its discretion in assessing the fairness of precluding Mrozek from relitigating in this action the facts underlying her criminal convictions. The court specifically considered whether Mrozek had an adequate opportunity to obtain a full and fair adjudication in the criminal case. The court thus applied the fifth of the *Michelle T.* factors, the factor that is most clearly committed to the exercise of trial court discretion. The court concluded that the criminal proceedings had afforded Mrozek a full and fair opportunity to litigate the nature of her conduct:

> The defendant pled guilty to charges that arose out of that commercial transaction after being advised by an attorney of what her alternatives were.
>
> One of the alternatives, I assume, in that defense was to present a defense that she acted unintentionally; that certainly was available to her in terms of the theft by fraud convictions.
>
> . . . .
>
> . . . [I]n my estimation, she made a decision in response to those charges to plead guilty knowing that she had the potential to raise that defense.
>
> She was advised by counsel with regard to those issues and she decided to plead guilty. That at least, in my estimation, says that . . . she's not able to claim that [the Mallery firm] caused her the restitution orders and attorney's fees and other costs that are associated with her criminal prosecution. And particularly when she's pled guilty to that charge, in order for her to recover those costs and expenses, she would have to have

507

gotten post-conviction relief setting aside her conviction or been determined to have been not guilty.

> If she had a trial and was determined not guilty, she may very well have been able to sue for malpractice, alleging that she had incurred costs as a result of the poor advice that she relied on, but I think where she pleads guilty, she waives any right to make a claim . . . .

¶ 28. We conclude that the trial court did not erroneously exercise its discretion in determining that, although she chose to forgo it, Mrozek had a full and fair opportunity in the criminal proceedings to litigate the nature of her conduct and the extent of her culpability for selling the PMI notes. This determination provided a proper basis for the trial court to conclude that it was not unfair to Mrozek to preclude her from relitigating issues encompassed by the criminal convictions. *See Butler v. Mooers*, 2001 ME 56, ¶ 8, 771 A.2d 1034 (concluding that issue preclusion may be applied to a conviction based on a guilty plea because the precluded party was given a " 'full and fair *opportunity* to litigate in the prior suit' ").

¶ 29. The remaining *Michelle T.* factors, which, as we have noted, the trial court did not expressly consider, largely involve questions of law that we are as well-positioned as the trial court to address. Accordingly, we briefly address those factors to determine whether any would weigh against applying issue preclusion in this case. With regard to the first factor, Mrozek could have sought review of the courts acceptance of her guilty plea by moving to withdraw it on the grounds that it was not knowing or voluntary, or that a factual basis was lacking. *See, e.g., State v. Mendez*, 157 Wis. 2d 289, 294, 459 N.W.2d 578 (Ct. App. 1990) (concluding that a defendant's concession at a plea

hearing that a factual basis for his plea exists does not preclude the defendant from asserting otherwise in a postconviction motion).

¶ 30.  The second factor, whether the issue is a question of law involving two distinct claims or intervening shifts in the law, also weighs in favor of issue preclusion. We are not aware of any "shifts in the law" relevant to Mrozek's claims against the Mallery firm that occurred between her conviction and this litigation. We also conclude, in any event, that the common issue is not a question of law but one of fact, and it is identical in both actions:  What did Mrozek do that resulted in her being convicted of several crimes?

¶ 31.  Similarly, we are not persuaded that there were significant differences in the quality or extensiveness of the criminal proceedings and this action that would warrant relitigation of the nature of Mrozek's conduct. The criminal action, like this one, was a circuit court action in which Mrozek was represented by counsel. There, as here, Mrozek could have had disputed factual issues determined by a judge or a jury. Her conviction did not result from an off-record stipulation, but was entered only after a judicial inquiry confirming the validity and integrity of Mrozek's guilty pleas. Finally, we note that our reading of the trial court's remarks quoted above lead us to conclude that this aspect of fairness, the third *Michelle T.* factor, was, like the fifth factor, an implicit part of the trial court's reasoning.

¶ 32.  The fourth fairness factor inquires whether the prevailing party's burden of proof in the first proceeding was lower than in the second, a fact which might render the application of issue preclusion in the second action unfair. *Jensen v. Milwaukee Mut. Ins. Co.*, 204 Wis. 2d 231, 239, 554 N.W.2d 232 (Ct. App. 1996).

509

Had Mrozek put the State to its proof in the criminal action, it was she who would have faced a much lesser evidentiary and persuasive burden in the first proceeding. She would have needed to persuade a fact finder only that the State had not proven beyond a reasonable doubt that all the elements of theft by fraud were present. Mrozek, of course, did not put the State to its proof, and we conclude that one cannot meaningfully refer to a burden of proof or persuasion at a plea hearing.[11] We conclude that the "relative burden" factor either has no applicability on the present facts, or at most, does not weigh heavily for or against applying issue preclusion in this action.

¶ 33.   Finally, the fifth *Michelle T.* factor requires a court to consider "matters of public policy" and the "individual circumstances involved," including whether the party sought to be precluded had "inadequate opportunity or incentive to obtain a full and fair adjudication" in the first action. *Michelle T.*, 173 Wis. 2d at 689. As we have discussed, these considerations were central to the trial court's determination, and the court did not erroneously exercise its discretion in concluding that Mrozek was not deprived of her right to a full and fair adjudication of her culpability for the crimes in question. Because Mrozek has made no showing that calls into question the validity of her guilty pleas and resulting convictions, we perceive no "matters of public policy" that would weigh against the application of issue preclusion in this case.

¶ 34.   We thus conclude that none of the *Michelle T.* factors provide support for overturning the trial

---

[11] If anyone bears a "burden" at a plea hearing, perhaps it is the presiding judge, who, as we have noted, must ensure that the requirements for accepting a guilty plea pursuant to Wis. Stat. § 971.08 and case law are fulfilled.

court's decision to preclude Mrozek from relitigating in this action any issues of law or fact encompassed by her criminal convictions. Her guilty pleas constituted an admission of the elements of theft by fraud, as well as of the material facts alleged in the charging document. *See McCarthy v. United States*, 394 U.S. 459, 466 (1969); *State v. Rachwal*, 159 Wis. 2d 494, 509–10, 465 N.W.2d 490 (1991). These facts were therefore actually litigated and decided in a prior action, *Northern States Power*, 189 Wis. 2d at 551, and for purposes of this action, it is established that Mrozek knowingly made false representations to purchasers of the PMI notes, intending to deceive and defraud them.[12]

¶ 35. The next question we must answer is "so what?" That is, what impact do the previously established facts have on Mrozek's ability to recover damages from the Mallery firm stemming from her prosecution and conviction? The Mallery firm asserts that Mrozek's knowingly false representations and her intent to deceive and defraud note purchasers are what caused her

---

[12] WISCONSIN JI—CRIMINAL 1453 identifies the following six essential elements of theft by fraud:

First, that the defendant made a false representation to (name owner of property).

Second, that the defendant knew that such representation was false.

Third, that the defendant made such representation with intent to deceive and to defraud (name owner of property).

Fourth, that the defendant obtained title to the property of (name owner of property) by such false representation.

Fifth, that (name owner of property) was deceived by such representation.

Sixth, that (name owner of property) was defrauded by such representation.

to be prosecuted and convicted. In the firm's view, this prevents her from claiming that the law firm's negligence caused her damages. The Supreme Court of Maine, whose reasoning the Mallery firm urges us to adopt, concluded in *Butler*, 771 A.2d 1034, ¶¶ 7–9, that even if a law firm gave "inaccurate legal advice," the client's "plea of guilty and his acknowledgement that he 'knowingly and wilfully' defrauded the banks precludes a finding that his criminal conduct was nonetheless proximately caused by [the law firm]'s negligent legal advice." *Id.*, ¶ 9.

¶ 36. Wisconsin courts generally avoid the notion of "proximate cause" and acknowledge instead that there is often more than one cause of a damage-producing event. *See Morgan v. Pennsylvania Gen. Ins. Co.*, 87 Wis. 2d 723, 735, 275 N.W.2d 660 (1979). However, even where a defendant's negligence is a substantial factor in producing the plaintiff's damages, recovery may be denied in Wisconsin on public policy grounds. *Id.* at 737; *Hicks v. Nunnery*, 2002 WI App 87, ¶ 34, 253 Wis. 2d 721, 643 N.W.2d 809, *review denied,* 2003 WI 16, 259 Wis. 2d 101, 657 N.W.2d 706 (Wis. Jan. 7, 2003) (No. 01–0751). Moreover, although denying recovery on public policy grounds often involves the application of a set of factors to the specific facts of a case, a court may also deny recovery in an entire class of claims for public policy reasons. *See Hicks*, 2002 WI App 87, ¶¶ 47–48.

¶ 37. We conclude that a defendant convicted of a crime involving knowing or intentional criminal acts may not recover damages arising out of his or her criminal prosecution and conviction from an attorney who provided negligent advice or representation to the defendant at or before the commission of the crime. The

public policy rationale underlying our conclusion is set forth in *Evans v. Cameron*, 121 Wis. 2d 421, 360 N.W.2d 25 (1985), where the supreme court applied the doctrine of *in pari delicto* in upholding the dismissal of a complaint alleging legal malpractice. The court explained that the "doctrine of *in pari delicto* is an application of the principle of public policy that '[n]o court will lend its aid to a man who founds his cause of action upon an immoral or illegal act.'" *Id.* at 427 (citation omitted).

¶ 38. The plaintiff in *Evans* alleged that her former attorney advised her to lie under oath at a bankruptcy hearing, which she then did, triggering a perjury investigation and prosecution. *Id.* at 424–25. She sought to recover damages stemming from her criminal prosecution that she asserted were "the result of the wrongful and illegal advise [sic]" she received from the defendant attorney. *Id.* at 425. The plaintiff claimed that the attorney was more blameworthy than she because "a client has the right to rely on the advice of the attorney." *Id.* at 427. The court rejected this argument, concluding instead that the "wrongfulness of lying while under oath" was "apparent," and the plaintiff's "deliberate act of lying under oath places that client *in pari delicto* with the attorney who advised that client to lie." *Id.* at 428. The court explained that the public interest is better served by applying the doctrine than by creating an exception based on the attorney-client relationship: "A court should not encourage others to commit illegal acts upon their lawyer's advice by allowing the perpetrators to believe that a suit against the attorney will allow them to obtain relief from any damage they might suffer if caught." *Id.*

¶ 39. Applied here, the supreme court's reasoning in *Evans* precludes Mrozek, on public policy grounds, from recovering damages arising out of her criminal prosecution and conviction from the Mallery firm. As we have discussed, it is established for purposes of this proceeding that Mrozek knowingly made false representations to note purchasers, intending to deceive and defraud them. We conclude that the wrongfulness of these acts is every bit as apparent as the wrongfulness of lying under oath. Even if negligent or inaccurate advice by the Mallery firm contributed to the course of conduct that resulted in Mrozek's prosecution and conviction, her admitted wrongdoing placed her, at a minimum, *in pari delicto* with the defendant law firm. The trial court did not err in dismissing this portion of her claim against the Mallery firm. *See id.* at 431.

¶ 40. Finally, we reject Mrozek's assertion that the present facts create one of the circumstances noted in *Evans* where the doctrine of *in pari delicto* may not apply. The supreme court explained in *Evans* that different degrees of wrongfulness may arise from " 'oppression, imposition, hardship, undue influence, great inequality of condition or age.' " *Id.* at 427 (citation omitted). Mrozek contends that we must conclude in this case that "the advice given [was] so complex that the client would be unaware of the wrongfulness involved in following that advice," *see id.* at 428, and thus that the Mallery firm was the greater wrongdoer. We reject the argument for the same reasons the supreme court did on the facts before it in *Evans*. The wrongfulness of Mrozek's admitted actions is "apparent," and the present record contains no evidence of "special circumstances constituting an exception to the rule of *in pari delicto* independent of the attorney-client relationship."

*Id.* In short, the existence of the attorney-client relationship, by itself, does not remove Mrozek's knowing and intentional criminal acts from the operation of the doctrine. *Id.*

II.

¶ 41.  Issue preclusion and public policy considerations bar Mrozek's individual claims against the Mallery firm only insofar as she sought to recover damages incurred as a result of her criminal prosecution and conviction. She also claims that the firm's negligence caused her damages in the form of lost income she would have derived in her capacity as manager from the future profits of PMI's operation of the motel. The trial court disallowed Mrozek's claim based on PMI's lost future profits because it concluded that the evidence offered to support the claim was too speculative, and therefore insufficient as a matter of law, to support such an award. We agree with the trial court's conclusion.

¶ 42.  We have summarized a plaintiff's evidentiary burden in attempting to prove damages from lost profits as follows:

> Damages for lost profits need not be proven with absolute certainty, but the claimant must produce sufficient evidence . . . on which to base a reasonable inference as to a damage amount. To establish lost profits, the claimant must produce evidence of the business's revenue as well as its expenses. Assertions as to the amount of lost profits have no evidentiary value unless supported by figures showing profits and losses.

*Lindevig v. Dairy Equip. Co.*, 150 Wis. 2d 731, 740, 442 N.W.2d 504 (Ct. App. 1989) (citations omitted). More recently, we explained that a new business may be able to establish a claim for lost profits, but only if the

claimant "can present credible comparable evidence or business history and business experience sufficient to allow a fact finder to reasonably ascertain future lost profits." *THW Enters. v. Kenosha Assoc.*, 206 Wis. 2d 591, 605 n.6, 557 N.W.2d 480 (Ct. App. 1996). As in *Lindevig*, however, we concluded in *THW* that the evidence offered by the plaintiff was "too speculative to support the jury's award." *Id.* at 605. We specifically noted that the "concept" of the enterprise in question "was unproven and any projections as to profit were purely conjectural." *Id.*

¶ 43. We conclude that PMI's submissions on summary judgment suffer from similar infirmities.[13] "[O]nce sufficient time for discovery has passed, it is the burden of the party asserting a claim on which it bears the burden of proof at trial 'to make a showing sufficient to establish the existence of an element essential to that party's case.' " *Transportation Ins. Co.*, 179 Wis. 2d at 291–92 (citation omitted). Thus, the Mallery firm "need only explain the basis for its [summary judgment] motion and identify those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' that it

---

[13] Mrozek and PMI were represented by the same attorney in the trial court and they responded jointly to the Mallery firm's summary judgment motion. They are also jointly represented on appeal and filed joint briefs. Thus far in this opinion, we have generally referred to the arguments and submissions in opposition to summary judgment as being Mrozek's because we were discussing her claim for damages arising from her criminal prosecution and conviction. Her remaining damage claim, however, depends on whether a sufficient showing was made that PMI suffered future lost profits. In discussing this issue and, subsequently, PMI's corporate claims, we will generally refer to the arguments and submissions as being PMI's.

believes demonstrate the absence of a genuine issue of material fact . . . ." *Id.* at 292 (citation omitted). The Mallery firm has done so here, and we agree with it and the trial court that PMI has failed to meet its burden to place in dispute whether it suffered lost profits on account of the law firm's alleged negligence.

¶ 44. PMI points to the following items in the summary judgment record as supporting its claim that it would have earned profits had it been able to retain ownership of the motel: (1) the franchise agreement between Mrozek and AmericInn, which promised assistance to Mrozek in operating the motel and which contemplated that the motel operation would be profitable; (2) the Offering Memorandum prepared by the Mallery firm containing income and profit projections; (3) deposition testimony regarding the economic growth and development of the area surrounding the motel since its construction; (4) an assurance that PMI "will offer extensive documentation and [will] put forth extensive testimony" addressing the lost profits issue at trial; and (5) five years of tax returns from the entity that ultimately purchased and operated the motel, purportedly showing that the motel became profitable after three years of operation.

¶ 45. The first four items PMI attempts to rely on as proof of its lost profits need not detain us long. The franchise agreement does contain promises by the franchisor to train and assist Mrozek in managing the motel. However, not only were we unable to locate in the franchise agreement any specific income or profit projections for the PMI motel operation, but the agreement contains numerous disclaimers such as this one:

> The LICENSOR expressly disclaims the making of, and the LICENSEE acknowledges that it has not received, any estimates, projections, warranties or guaranties,

express or implied, regarding the potential Gross Revenues, profits, earning or financial success of the LICENSEE'S AmericInn® Motel, except as may be set forth in the Licensor's Uniform Franchise Offering Circular, a copy of which has been received by the Licensee.[14]

Similarly, the CPAs who prepared a "forecasted statement of operations and pre-tax cash flow" that accompanied the PMI stock-offering statement informed readers of the statement that it contained

information that is the representation of management and does not include evaluation of the support for the assumptions underlying the forecast. We have not examined the forecast and, accordingly, do not express an opinion or any other form of assurance on the accompanying statements or assumptions. Furthermore, there will usually be differences between the forecasted and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material.

In short, nothing in these two documents rises above mere speculation and conjecture.[15]

---

[14] We were unable to locate any document in the record identified as a Uniform Franchise Offering Circular.

[15] PMI also cites an appraisal of the property prepared at the time that it was attempting to obtain bank financing for the motel project. The appraisal contains a valuation based on the "income capitalization approach," but notes that the "income, expenses, and conversion rates estimated in this analysis are unknown variables which will occur in the future . . . . [B]ecause the real estate market is constantly changing, no warranty or representation is made that these projections will occur as estimated in this report." Thus, the projections contained in the appraisal carry no better endorsement of their validity than do those in the CPA "forecast."

¶ 46. We have been unable to locate in the record, which contains several excerpts of deposition transcripts, any testimony describing the commercial growth of the area surrounding the motel following its completion, and PMI provides no record citations to assist us in this regard. But, even if we had located testimony to that effect, it would tell us nothing about whether PMI's operation of the motel would have generated profits. Of even less value is PMI's assertion in a trial court brief in opposition to summary judgment that it "will offer extensive documentation addressing the lost profits in this case and put forth extensive testimony on these issues." PMI cannot respond to the Mallery firm's summary judgment motion with a mere promise to produce evidence at trial. *See Moulas v. PBC Prods., Inc.*, 213 Wis. 2d 406, 410–11, 570 N.W.2d 739 (Ct. App. 1997), *aff'd*, 217 Wis. 2d 449, 576 N.W.2d 929 (Wis. Apr. 30, 1998) (No. 96–1784) (noting that once a motion for summary judgment "is made and demonstrates the support required by the statute, the opponent does not have the luxury of resting upon its mere allegation or denials of the pleadings, but must advance specific facts showing the presence of a genuine issue for trial").[16]

¶ 47. That brings us to the tax returns of the entity that acquired the motel during PMI's bankruptcy proceedings and operated it thereafter. These could form at least the beginnings of a showing of lost future

---

[16] We note that WIS. STAT. § 802.08(4) permits a party opposing summary judgment to obtain a "continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had." The trial court granted PMI's request to withhold ruling on the lost profits issue until it could obtain the tax returns of the entity operating the motel and conduct an additional deposition.

profits sufficient to survive summary judgment. According to PMI's analysis of these tax returns, they demonstrate that the new owner began showing positive "ordinary income" from the motel operation in its third year of operation, which in years three through six ranged from $57,000 to $89,000 annually. What is missing, however, is any testimony, expert or otherwise, linking the apparent profitability of the motel operation under the new owners to the profits PMI might have earned had it retained ownership of the motel.

¶ 48.   We agree with the trial court's analysis:

> I think that . . . the income history of the corporation that's actually functioning there is relevant information and would be admissible as to profit projections for the proposed PMI, Plover Motel, Incorporated.

> What I don't believe is here, however, is the opposite side of the ledger and that is evidence that would detail the proposed expenses of this operation. Certainly the purchase price for the operating business that's at that location now and the purchase price for the Plover Motel, Incorporated were different and the capitalization of those two operations, how much debt they incurred, what the interest rates were on the debt that was incurred are, I would assume, different . . . .

> And the projections of profit can't be accomplished without a correlation between the expense portion of the ledger and the projections on income . . . .

> So lacking that, I don't believe there is evidence in the record that's sufficient to support the judgment in terms of projected profit of the corporation and, therefore, management expenses to be paid to [Mrozek] . . . .

Thus, PMI's purported showing of lost profits suffers from much the same infirmity as that in *Lindevig*, where we concluded that the "plaintiffs failed to meet

their burden of proof because they did not produce evidence of expenses." *Lindevig*, 150 Wis. 2d at 740.

¶ 49.  We therefore conclude that PMI failed to meet its burden on summary judgment to submit evidence that, at a minimum, places in dispute whether the loss of ownership of the motel property caused PMI to lose future profits. Jurors are instructed that if they "find the evidence . . . to be so uncertain that you cannot do more than merely guess, speculate, or conjecture as to whether (plaintiff) is entitled to recover certain damages due to the loss of future profits, then you cannot award damages for future profits." WIS JI—CIVIL 3725. Based on the record before us, jurors could only "guess, speculate, or conjecture" what profits PMI might have derived from operating the motel, and thus, the Mallery firm is entitled to summary judgment dismissing any claims for damages based on lost profits. This disposes of Mrozek's remaining individual claim against the Mallery firm, and PMI's claim for future lost profits as well.

### III.

¶ 50.  In addition to its alleged loss of future profits, PMI claims to have suffered damages from its loss of ownership of the motel property and from its outlays for attorney's fees and costs in the bankruptcy and related matters. Our final task, therefore, is to determine whether the trial court erred in granting the Mallery firm summary judgment on these remaining PMI claims. We conclude that it did not.

¶ 51.  The Mallery firm maintains that PMI is precluded from pursuing its negligence claim against the firm because the trustee in PMI's bankruptcy could

521

have pursued it, but did not, and the order closing the bankruptcy operates as a final judgment on the claim. In other words, the Mallery firm asks us to conclude that the doctrine of claim preclusion prevents PMI from asserting its claim against the firm in this action. Whether claim preclusion applies to a given set of facts is a question of law which we decide de novo. *Lindas v. Cady*, 183 Wis. 2d 547, 552, 515 N.W.2d 458 (1994).

¶ 52.   Claim preclusion prevents relitigation of the same claim when:   (1) there is an identity of parties or their privies in the prior lawsuit; (2) there is an identity of claims for relief that were brought, or could have been brought; and (3) a final judgment on the merits in a court of competent jurisdiction resolved the first lawsuit. *Northern States Power*, 189 Wis. 2d at 551. Claim preclusion is " 'designed to draw a line between the meritorious claim on one hand and the vexatious, repetitious and needless claim on the other hand.' " *Id.* at 550 (quoting *Purter v. Heckler*, 771 F.2d 682, 689–90 (3rd Cir. 1985)). Fairness to all parties and to the use of judicial resources requires that at some point litigation over a specific controversy must come to an end. *DePratt v. West Bend Mut. Ins. Co.*, 113 Wis. 2d 306, 311, 334 N.W.2d 883 (1983). However, claim preclusion should not be applied in a way that will deprive a party of a full and fair determination of an issue. *Pasko v. City of Milwaukee*, 2002 WI 33, ¶ 22, 252 Wis. 2d 1, 643 N.W.2d 72.

¶ 53.   PMI does not dispute that its claim against the Mallery firm that PMI listed as an asset on its bankruptcy schedules is the identical claim it advances in this action. The Mallery firm contends that the remaining elements necessary for claim preclusion to apply are also present. Specifically, the firm maintains

that PMI is "in privity" with the trustee because the trustee held title to the malpractice claim during the Chapter 7 proceedings, and the order closing the bankruptcy case therefore operated as a final judgment precluding PMI from now pursuing the claim. The law firm notes that there can be no question the trustee was aware of the Mallery claim because it was scheduled as an asset of PMI's and because the claim's potential value to the estate was cited by PMI as a reason not to convert the proceedings from Chapter 11 to Chapter 7.

¶ 54.   The firm also points out that it was a scheduled creditor of PMI for unpaid legal fees, and that the trustee pursued another scheduled claim against a different creditor (the contractor), albeit unsuccessfully. Thus, in the Mallery firm's view, because the trustee could also have pursued the malpractice claim, the trustee's uncontested decision not to pursue the claim precludes PMI from pursuing it now.

¶ 55.   The Mallery firm relies on several U.S. Circuit Court of Appeals decisions that apply claim preclusion to bar post-bankruptcy attempts by debtors to pursue claims against former creditors. The facts in *Bank of Lafayette v. Baudoin*, 981 F.2d 736 (5th Cir. 1993) closely parallel those before us. As PMI did in this case, the debtors in *Baudoin* listed on their Chapter 7 bankruptcy schedules a "possible claim" against a creditor (a bank) as an asset of "undetermined" value. *Id.* at 738. The debtors "informed the trustee of their possible claim against the Bank very early in the bankruptcy proceeding." *Id.* Three years after their bankruptcy cases were closed, the debtors sued the bank in state court, "seeking over $4,000,000 in damages for both breach of the loan agreements and numerous related tort claims." *Id.* The bank commenced a federal court action to enjoin the state court action against it. *Id.*

¶ 56. The federal appellate court began its analysis by stating that "the numerous and substantial reasons for the doctrine of [claim preclusion] are too well known, and obvious, to bear repeating." *Id.* at 740. It explained that a "bankruptcy judgment bars a subsequent suit" if the requirements for claim preclusion are met. *Id.* The court first determined that the lender liability claim at issue would have been a "core proceeding" and that the bankruptcy court therefore had jurisdiction to hear it. *Id.* at 740–42. The court then concluded that, regardless of the fact that the trustee had elected not to pursue the lender's liability claim during the pendency of the bankruptcy, the requirements for claim preclusion were met. Specifically, the court determined that certain orders entered by the bankruptcy court were "final judgments on the merits for [claim preclusion] purposes." *Id.* at 742.[17]

¶ 57. As to the "identity of the causes of action," the court noted that it had adopted the "transactional test" under which " 'the critical issue is . . . whether . . . the two actions [are based] on the same nucleus of operative facts.' " *Id.* at 743 (citation omitted).[18] Because the debtors' lender liability claims arose out of the

---

[17] It was apparently necessary for the court in *Baudoin* to look to these interlocutory orders because the bankruptcy case had been reopened and the trustee impleaded in the state court action on the lender's liability claim. *Bank of Lafayette v. Baudoin*, 981 F.2d 736, 742 n.14 (5th Cir. 1993). The court's discussion leaves little doubt, however, that an order closing a bankruptcy case that is not reopened would constitute a final judgment for claim preclusion purposes. *See id.*

[18] Wisconsin has also adopted the "transactional approach to determining whether two suits involve the same cause of action." *See Northern States Power Co. v. Bugher*, 189 Wis. 2d 541, 553, 525 N.W.2d 723 (1995).

very loans that comprised the bank's claims against the debtor in the bankruptcy, the court found it "difficult to imagine a more common nucleus of operative facts." *Id.* Accordingly, because the lender's liability claim could have been asserted as a defense or offset to the bank's loan claims in the bankruptcy case, the court found the elements of claim preclusion had been established, and it directed the entry of an order enjoining the debtors from pursuing the claim in state court. *Id.* at 744.[19]

¶ 58.   PMI has not brought to our attention any cases from other jurisdictions where a court has considered the doctrine of claim preclusion and declined to apply it on facts similar to those in *Baudoin* and here. Rather, PMI's principal argument focuses on the concept of "abandonment" in the context of bankruptcy proceedings. PMI contends that after the trustee appointed to administer PMI's bankruptcy estate declined to pursue the claim against the Mallery firm, the claim was abandoned pursuant to 11 U.S.C. § 554(c) when the bankruptcy case was closed.[20]

¶ 59.   PMI points out that when a claim is abandoned by a bankruptcy trustee, the right to pursue the claim revests in the debtor as though the bankruptcy proceeding never occurred. *See Barletta v. Tedeschi,* 121 B.R. 669, 672, 673 (N.D.N.Y. 1990). Therefore, according to PMI, because the trustee's decision not to pursue the Mallery claim is not binding on PMI, it cannot be deemed to be in privity with the trustee and it should

---

[19] The debtors in *Baudoin* did not dispute that "both cases involve the same parties." *Baudoin,* 981 F.2d at 740.

[20] 11 U.S.C. § 554(c) provides as follows:   "Unless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title."

thus be free to pursue its claim against the law firm in this action. PMI also argues that the entry of an order closing a bankruptcy case is a "ministerial function" that cannot be treated as the equivalent of a final judgment on its claim against the Mallery firm for claim preclusion purposes.

¶ 60.    PMI principally relies on an Alabama Supreme Court decision for the proposition that when property is abandoned by the trustee and reverts to the debtor, the bankruptcy court loses jurisdiction over the property and "any interested party may pursue its rights to the property under applicable state law." *Roberts v. Pearce Constr. Co., Inc.*, 624 So. 2d 1009, 1012 (Ala. 1993). Both *Barletta* and *Roberts*, however, were concerned with a party's "standing" to bring claims that had been abandoned by a bankruptcy trustee. *See Barletta*, 121 B.R. at 674; *Roberts*, 624 So. 2d at 1012. The court in neither case addressed the possibility that claim preclusion might bar a debtor from pursuing in post-bankruptcy litigation what is essentially a counterclaim against a creditor who filed a claim in the debtor's bankruptcy.

¶ 61.    As we have discussed, that possibility is squarely addressed in *Baudoin*. Two other federal cases cited by the Mallery firm also apply claim preclusion to claims that have revested in a debtor after a bankruptcy proceeding. The Second Circuit has concluded that the doctrine of claim preclusion bars the bringing of "lender liability claims that could have been brought before a final plan for reorganization was confirmed, but weren't," even though the confirmation of a Chapter 11 reorganization plan " 'vests all of the property of the estate in the debtor.' " *Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 873 (2nd Cir. 1991) (citation omitted). The court explained that the revest-

ing of title in the debtor was "subject to the [claim preclusion] bar" in the absence of a specific reservation in the plan of the debtor's right to pursue it. *Id.*; *see also D&K Props. Crystal Lake v. Mutual Life Ins. Co. of New York*, 112 F.3d 257 (7th Cir. 1997) (discussing the "exception to [claim preclusion] that expressly reserved suits may survive a final bankruptcy order").

¶ 62.   Our review of the present record discloses no express exception or reservation granted in PMI's bankruptcy proceedings that would allow it to pursue the Mallery malpractice claim post-bankruptcy. Because the Mallery firm presents persuasive authority for the application of claim preclusion on the present facts, and PMI has failed to distinguish or refute that authority, we conclude that when the malpractice claim against the Mallery firm revested in PMI upon the closing of PMI's Chapter 7 bankruptcy, it did so subject to the claim preclusion bar. Accordingly, we conclude the trial court did not err in applying the doctrine of claim preclusion to dismiss PMI's claims in this action.[21]

---

[21] The Mallery firm also argues that if the Chapter 7 trustee's opportunity to pursue the malpractice claim does not bar PMI's pursuit of the claim after the closing of the bankruptcy case, the order converting PMI's original Chapter 11 proceeding to Chapter 7 should be deemed to have done so. PMI unsuccessfully objected to the conversion on the basis that its claims against the contractor and the law firm were assets of value that could fund a reorganization of the corporation. The Mallery firm asserts that the conversion order was a final order that PMI or any creditor could have appealed, and thus PMI should be precluded from relitigating the malpractice claim now. Because we conclude that the trustee's opportunity to

## CONCLUSION

¶ 63.  For the reasons discussed above, we affirm the judgment of the circuit court.

*By the Court.*—Judgment affirmed.

---

pursue the claim is preclusive, we do not address the alternative argument based on the conversion order.